## THE SALVORE.

### Petition of NAVIGAZIONE LIBERA TRIESTINA, S. A.

No. 11354.

District Court, E. D. New York.
June 29, 1931.

See also (D. C.) 33 F.(2d) 967.; (D. C.) 34 F.(2d) 150, 152.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City, for petitioner.

Single & Single, of New York City, for claimants.

BYERS, District Judge.

This is a limitation proceeding founded upon a petition filed April 20, 1929. Fourteen claimants have filed two answers. As to one, the pleading is on behalf of three claimants, and, as to the other, eleven are joined. The fourteen claims have been filed and reported by the Commissioner.

The petition alleges ownership of the steamship Salvore, a steel vessel of about 290 feet in length and 54 feet beam; that, on June 15, 1926, after a voyage from the ports of Philadelphia and New York, and while in the port of Genoa, Italy, with a cargo on board destined for Naples, Piraeus, and Salonica, the ship was damaged by fire which also caused loss and damage to a part of the cargo. That said cargo damage and short or non-delivery of any part of the cargo were caused by the fire, and that the latter was not caused by the design or neglect of the petitioner, i. e., the so-called fire statute (46 US CA § 182) exempts the petitioner from liability. Clauses are quoted from the bills of lading, purporting to exempt the petitioner from liability, and entitling the petitioner to the benefit of insurance, etc.

That the value of the vessel after the fire and of pending freight totaled not to exceed $47,777.86. The benefit of limitation is asserted (46 USCA §§ 183, 184, 185, and 186), and appropriate relief is prayed.

The answer filed for the three claimants, United States Steel Products Company et al., comprehends all the issues presented by claimants, namely: Denials of proper and complete quotations from the bills of lading; unseaworthiness; denial that petitioner is entitled to the benefit of insurance, and the following defenses: Pendency of certain litigation in Italy. (This the petitioner has stayed, and the subject requires no present consideration.) Formal defects in the petition. (This was not urged on the trial, and has not been referred to in the briefs, and is considered abandoned.) Deviation at Genoa in causing repairs there to be made. Unseaworthiness. Delay at Philadelphia and deviation in New York in connection with certain repairs there made. Laches in instituting this proceeding. (The latter defense has not been pressed, and is considered to have been abandoned.)

The fourteen claims for cargo damage embrace five separate shipments taken at Philadelphia, three destined for Naples, one for Piraeus, and one for Palermo, Naples, and Piraeus; and nine taken at New York, of which four were destined for Naples, three for Piraeus, one for Genoa, and one for Salonica.

In completing her west-bound voyage, prior to the one during which the fire occurred, the Salvore was in collision with the steamship Dorothy Luckenbach, i. e., the latter scraped along the port side of the Salvore, in a fog, while she was proceeding up Delaware Bay, bound for Philadelphia, on May 2, 1926.

The damage occasioned by the collision involved two plates on the port side of the forecastle, and one bulkhead plate, port side, after end of the forecastle, together with a bounding angle; all rails and stanchions between the forecastle and the front of the bridge, on the port side; one bridge side shell plate (port side); front of bridge bulkhead and bounding angle; shell plate abaft the after end of the bridge in the sheer strake (opposite the bunkers); port rails and stanchions along the bridge; wood deck; water service pipe; port stanchions supporting bridge.

It was not a serious damage, nothing "to become excited about" in the opinion of the surveyor for Lloyd's Register. He says the vessel was physically fit to carry cargo, except in the bridge deck space, where the damage was greatest. Below the main deck the vessel was tight. Surveys were held at once, and on May 6th the surveyor for Lloyd's Register recommended that the vessel be "continued as classed + 100 A1 shelter deck, subject to either permanent or temporary repairs being made on her arrival at New York. The vessel now being fit to proceed to New York." The printed word "carry" was omitted from the foregoing, having been crossed out by typed characters, and the words "proceed to New York" inserted.

This omission is thought to have indicated, on the part of this surveyor, a refusal to certify the vessel as seaworthy for cargo, in proceeding from Philadelphia to New York. He so testified.

His objection to the carrying of cargo, as distinguished from the human beings constituting the ship's company, from Philadelphia to New York, seemed to be based upon his recollection of a broken water service pipe, which in his view constituted a fire hazard.

He was unable to state from memory, or point out on a photograph of the ship in her damaged condition, the break in the pipe.

The surveyor for the hull underwriters was called, and testified quite clearly to the survey which he made on the same day as the one referred to above, and he said that the pipe was bent, and brackets required renewal. That he had no memorandum, in his original notes, of the pipe having been broken.

Without recounting the evidence in detail, it is deemed to have established that the water service pipe was not fractured as the result of the collision, but was bent and misplaced; that the Salvore was seaworthy to make the trip from Philadelphia to New York, and that she proceeded thence with due diligence.

Certain contentions of the claimants, with respect to conditions under which so much of the voyage was undertaken, seem to require consideration:

First, that, because of the restricted form of the Lloyd's Register certificate above referred to, the vessel was not permitted to carry cargo. The testimony shows a negative state of affairs as to this matter, and what was said on the stand by the surveyor (Mr. Buchanan) is not convincing that he took the trouble to observe whether or not the stowing of cargo was going forward at the very time he was making the survey. If he intended to withhold classification if cargo was to be taken on the voyage to New York, it is thought that some declaration of a positive nature, to that effect, was requisite.

It is next asserted that there were no fire-fighting facilities available on deck, and the crew was so reduced (through desertions and discharges prior to departure from Philadelphia) that emergent action could not have been taken if required. The first aspect of this contention is contrary to the evidence, and no attempt has been made to demonstrate the latter by appropriate reference to the testimony. It is contended that there was a breach of the contract of affreightment in limine by reason of these things, amounting to deviation. Charbonnier v. U. S. (The Pinellas) 45 F.(2d) 166, 1929 A. M. C. 1301 (D. C.), is cited as an authority for this contention.

In that case, the question of deviation, based upon the towage of the carrier because she could not proceed from the initial port of departure under her own power, was thought to have so increased the risk ordinarily to be expected by cargo interests, that deviation was involved and the carrier became an insurer. It is not necessary to disagree with that opinion in order to conclude that in this case the evidence fails, by a wide margin, to establish deviation at inception of the voyage, with respect to cargo laden at Philadelphia.

The process of taking cargo went forward on May 4th, and continued until early morning of the 7th, when departure was had for New York. On the 8th, the vessel moored at Erie Basin Pier 3, and, on the 10th, loading of cargo was carried on and repairs were made under supervision of the surveyor, representing Lloyd's Register. This dual activity proceeded until May 12th, when the voyage was resumed to the several ports of destination referred to above.

It is conceded by proctors for the claimants that the repairs made at New York were necessary, so far as the vessel was concerned, and did not constitute deviation. Nor is the seaworthiness of the ship when she left New York drawn into question.

■ The voyage proceeded without untoward incident, and, on nearing the Mediterranean on May 27th, a message was received from the petitioner to put into Oran to coal. That port was entered on May 29th in the early morning, and bunkers were taken.

This incident requires attention because it is the basis of another of claimants' contentions of deviation.

The testimony is that, in point of distance, the course from New York to Genoa via Oran is about 50 miles longer than if the latter is omitted, and about 5 hours' additional time is consumed through stopping at the latter port for bunkers. No cargo was taken although the log mentions provisions, among which was wine.

Objection is made to this maneuver, for the reason that, in taking bunkers, more coal was loaded than was necessary for the eastward voyage. The testimony of the chief engineer, and that of the second officer as well, demonstrate the necessity for taking coal at the western end of the Mediterranean in order to provide for reasonable requirements on the voyage in question, involving Greek ports where proper steaming coal is not easily available. It is unnecessary to restate the computations appearing in the testimony of these two officers, the result being that it was reasonably necessary on this voyage to follow the customary practice as shown, in this respect.

■ Reference is made to the fact that, as the vessel contained in her cargo space, in Nos. 1 and 6 holds, coal which was carried as cargo, consigned to the petitioner by itself, for Genoa, resort to such cargo should have been had, rather than to expose the claimants to the additional hazard, not contemplated by the contract of affreightment, involved in the call at Oran.

The bills of lading, which describe the voyage as from the port of New York to Mediterranean, Italian, and Spanish ports, contain the following: "1. The carrier may substitute, or transship by any other or succeeding steamer, and the steamer with the goods on board, either before or after proceeding toward the port of discharge, may proceed to and stay at any port or places whatsoever, although in a contrary direction to or outside of or beyond the usual route to the said port of discharge once or oftener in any order, backwards or forwards, for loading, or discharging cargo, coal and passengers, or for any purpose whatsoever, and all such ports, places and sailings shall be deemed included within the intended voyage. This liberty is not to be considered as restricted by any words of this contract, whether written, stamped or printed."

No authority is cited to sustain the contention that cargo should have been used in lieu of the taking of bunkers at Oran. In the absence of such, it would seem that the promptings of the obvious might well control this aspect of the controversy. The difficulty of feeding boilers with fuel derived from the holds of a ship, most remote from the area of combustion, would seem to preclude such activity in the absence of sheer emergency.

■ Nor is it considered that, in order to avoid deviation, in the legal sense, either the owner or the master of a ship is required to abdicate to cargo interests that reasonable control over the course of a vessel which is inherent in the conduct of a voyage properly initiated, under a written contract such as is here involved.

The authorities relied upon by the claimants in this connection are the following:

The Maine (D. C.) 8 F.(2d) 291. The ship was chartered to take a cargo of wheat from Galveston to the west coast of Italy. Sufficient fuel was not taken, at the loading port, to enable the vessel to perform her engagement, although the court finds that the fuel could have been there procured. The ship went to New York in order to effect a saving of a considerable sum of money in purchasing fuel, and this was held to be deviation, not excepted in the contract of affreightment.

As to the Salvore, the evidence shows that she left Philadelphia with full bunkers, her customary supply of about 800 tons, and no

contention has been made to the contrary. The Maine, therefore, does not sustain the claimants' position.

The Willdomino, 272 U. S. 718, 47 S. Ct. 261, 262, 71 L. Ed. 491. In this case, the carrier left Messina, Sicily, with a shipment of citrate of lime for delivery at New York, covered by bills of lading "with liberty to call at intermediate ports or any port or ports in or out of the customary route in any order, to receive and discharge coal, cargo," etc. Bunkering was permitted at any ports, in or out of the way. The vessel put in at Gibraltar, Lisbon, the Azores, North Sydney (Nova Scotia) and Halifax. Departure from the Azores was made with a "grossly inadequate" supply of coal to enable her to reach New York; after proceeding five or six days toward the latter, she altered her course, and proceeded to North Sydney, where she arrived with sixty-two tons of coal. This was held to be a deviation, not caused by emergency, but arising out of the failure to provide adequate fuel on departure for the port of destination.

It is difficult to understand the relation between the facts presented in that case and those involved in this record.

Enough has been shown to dispose of the contention that there was deviation involved in the call at Oran.

The Salvore resumed her voyage during the evening of May 29th, and came to her moorings in Genoa during the afternoon of June 2d. The 3d was a holiday, and discharge of the cargo commenced on the 4th, and proceeded in due course thereafter, with the exception of the 6th and 13th, which were Sundays. The fire occurred on the 15th, and it now becomes necessary to consider all available information somewhat critically, in the light of the several contentions of the claimants respecting the events in the port of Genoa.

Arrangements were made by the petitioner for the making of permanent repairs to the ship, rendered necessary by the collision to which reference has been made, while the discharge of Genoa cargo was going forward, and the taking of cargo destined for later ports on the voyage.

It is contended that this constituted deviation in and of itself, because the necessity for repairs arose on a prior voyage, and before cargo was laden for this voyage, and that the extra hazard involved in prosecuting the repairs under these circumstances involved such a departure from the conventional relations of carrier to cargo as to impose upon the former the obligations of insurer.

Reliance is placed upon The Indrapura (D. C.) 171 F. 929, and several cases said to follow that decision.

In considering the bearing of the cases so cited, it becomes necessary to understand the nature and stowage of this cargo; the nature and extent of the damage to the structure of the ship, and the extent to which the repairs involved contact with the cargo space.

The cargo plan discloses that there are six holds in the ship. Nos. 1 and 6 contained coal, both in the holds and 'tween decks. Holds Nos. 2 and 3 and 'tween decks contained cargo as follows: No. 2 hold, barrels and drums of lubricating oil and barrels of wax; No. 2 'tween decks, miscellaneous, such as wheels, an automobile, pianos, tin plate, and 600 bags of wax. This is probably the paraffin referred to in many parts of the testimony; it was stowed in the after part of the 'tween decks, directly against a wooden bulkhead separating that space from No. 3 'tween decks.

No. 3 lower was stowed with grain; No. 3 'tween with scrap brass, hides, and tin plate. Directly over the latter is what is called the bridge deck space, which is available for cargo. The bridge deck is roughly amidships and extends for perhaps one-third of the length of the ship, and the area between this and the main deck, being inclosed, is this bridge deck space, and the sides of this space were used for cargo purposes, from the forward end to the center of the ship which contains the ship's engines. That space is coextensive fore and aft with No. 3 hold and 'tween decks. Therein seems to have been stowed some 30 drums of printing ink, also asphalt, and oil (aft).

Aft of the engine space are Nos. 4 and 5 holds and 'tween decks, containing, as to No. 4 lower, wheat, oil, sugar, brass, and hides; as to No. 4 'tween, sugar, tin plate, hides, etc. In No. 5 lower, there were hides and oil, and in No. 5 'tween, sugar, hides, tires, etc.

The important items of repair, as recommended by Lloyd's registry, may be summarized as follows:

Forecastle: Plates faired and replaced; boundary angle renewed; handrails and stanchions straightened and repaired.

Bridge front, port side: Wing plate, boundary angle and coaming plate renewed. Fore end, No. 1 frame cut at upper deck, renewed and bracket fitted to deck. Deck beams and beam knees faired and renewed.

Bridge deck: Stringer plate cut; butt raised and renewed; stringer angle renewed and extended; wood deck in way repaired. Handrails and stanchions repaired.

Wash deck service pipe: Part renewed, part repaired.

Life-boat davit: Sockets to be removed, faired, and replaced.

Accommodation ladder (leading from forward end of bridge deck to main deck) to be renewed with part old fittings.

Shell plate in upper deck sheerstrake (near bunkers): Removed, faired, and replaced. Three frames to be faired in place.

The remaining items were quite removed from the cargo in the bridge deck space, and from Nos. 2 and 3 'tween and No. 2 hold.

The contract price for these repairs was about $2,500.

Petitioner's Exhibit 30 is the certificate issued by Lloyd's Register in New York on May 12, 1926, setting forth that recommended temporary repairs have been made, and classification is recommended for continuation without fresh record of survey "subject to permanent repairs being effected at the termination of the vessel's intended voyage to Genoa, being fit to carry dry and perishable cargoes, except in bridge space."

The importance of maintaining classification both to hull and cargo interests requires no exposition.

Considering now these facts, with reference to the authorities relied upon:

The Indrapura (D. C.) 171 F. 929 and Id. (D. C.) 238 F. 853. The vessel was drydocked (where fire occurred attended by neglect) at Hong Kong for inspection and survey in connection with classification, and to have the bottom scraped and painted. This would have been deviation except for a controlling custom in obedience to which the agent for the owner acted. While the views expressed in the first decision, involving exceptions to the libel, are expressly reaffirmed in the second, which was rendered after the trial, the case is an authority, in its final aspect, upon a similar state of facts only, and can scarcely be thought to control the issues here presented. It might or might not have been deviation for the Salvore to undergo these repairs, quite without reference to what was done to the Indrapura.

The Malcolm Baxter, Jr., 277 U. S. 323, 48 S. Ct. 516, 72 L. Ed. 901. Here the vessel was unseaworthy at the outset of the voyage, without the actual knowledge of the owner, although the condition could have been discovered with due diligence. Limitation of liability was denied, but cargo was restricted to actual damage from unseaworthiness.

The Sarnia (C. C. A.) 278 F. 459. This case involved deck stowage of cargo contrary to the agreement of the parties.

Sheldon & Co. v. Hamburg (C. C. A.) 28 F.(2d) 249. Loss of a part of cargo shipped from Hamburg, i. e., only three of seven cases were delivered, the missing four not being found. Held, deviation could not be raised for first time on appeal.

The Pelotas (D. C.) 43 F.(2d) 571. In a voyage from Santos, Brazil, to New Orleans, the ship departed from the customary course, having in effect left that course for about six days. Limitation was denied, because of the deviation.

Lighter & Co. v. U. S. Shipping Board (D. C.) 24 F.(2d) 536. Damages asserted in libel were caused by delay in delivery, due to a strike of machinists whose services were required on the engine and machinery. Held, the exceptions in the bill of lading covered the case, and the libel was dismissed.

It will be seen that none of the foregoing decisions can be said to establish, as a matter of law, that deviation resulted from the fact that repairs were undertaken on the Salvore, in Genoa, while cargo was being discharged and laden. In other words, the nature of the repairs, and the incidents of making them, and the natural and probable effect upon cargo, reasonably to be anticipated, would seem to be involved in a determination of the question of deviation.

One way to view the matter is to seek the opinion of practical men, as expressed before the work was started. For instance, the petitioner ordered the repairs after procuring consent of Italian and English underwriters. It is thought that the consent would not have been given if the work to be done necessarily imported an increase in the conventional hazard and risk assumed by cargo.

The fact that many informed witnesses testify that it is customary, where facilities exist, to make deck repairs with cargo on board, and, if necessary, to use the acetylene flame, probably explains why the consent of the underwriters was given.

Having in mind that the surveyor for Lloyd's Register in New York anticipated that the repairs would be made in Genoa, and that the Italian and English underwriters

consented, it becomes necessary to conclude whether after-acquired knowledge tends to discredit these two anticipatory points of view.

It is requisite to weigh, at this time, the argument advanced by claimants, that there is a difference between repairs rendered necessary by incidents of the voyage then pending, and those of a prior venture. This is thought not to establish a helpful test.

If the repairs were obviously of such a nature that the making of them and the necessary use of forges and flame in heating rivets and cutting plates would endanger cargo in the vicinity of the operations, it is thought the extra hazard would not diminish because the damage occurred during the pending voyage. And, if the reverse were true, the measure of the hazard would not be increased because the damage was inflicted before cargo was taken.

Examining the relation between the damaged portions of the ship and the cargo, the following conditions are revealed:

The damaged forecastle plates were above the main deck, and separated from No. 2 hold by nearly the fore and aft dimension of No. 1 hold. The removal, fairing, and replacing thereof involved no hazard to the cargo, and none to the ship, if properly conducted. The fact that paint and oil were stowed in the forecastle, in the absence of evidence as to the place and conditions of the stowage, does not prove that any hazard to the ship was involved in this repair.

The plate constituting the forward end of the bridge deck space, requiring a replacement of removed section, at the port side, also an above deck operation, falls within the same category. No contact with the main deck was involved, so far as the plate was concerned.

The bounding angle connecting the foregoing with the side plating, being also above the main deck, and the tie or coaming plate at the top of the same plate, are considered as part of the plate for present purposes.

The bounding angle connecting the bridge front (i. e. the forward wall, so to speak, of the structure supporting the bridge) and the side plating required renewal. In other words, a new angle bar had to be put into place. To effect this repair, the rivets holding the flange of the old bar to the main deck had to be removed so that the bar might be disengaged.

The rivet holes in the main deck, five in number, were thus to be exposed. If the

holes were to be left open, access to No. 2 'tween decks by sparks, molten metal or other agencies of combustion would be possible. Should it have been anticipated that the holes would be left open? An affirmative answer to this question would require a complete disregard of all the testimony as to ship repair practice in such matters, and as to what actually was done in this case.

Bearing in mind that, for the moment, the question is: What should have been foreseen?—it is to be observed, by way of answer, that reflection upon the testimony induces the belief that, so far from expecting that these apertures would be permitted to become sources of danger by being left open, the contrary was the teaching of ordinary understanding and familiarity with prevailing practice.

The subject will later be referred to in connection with the way in which the repairs actually were made.

The accommodation ladder could be repaired without disturbing the supporting plates upon the main deck.

The shell plate in the upper deck, although near the bunkers, could be repaired, even though the oxyacetylene flame were to be used, from staging rigged outboard, and well removed from the cargo.

These were the more important items of damage, and all others were obviously capable of attention in such a way that damage to either hull or cargo could not reasonably be anticipated.

It results, therefore, that the damage to the Salvore was of such a nature that repairs could be safely contracted for, while discharge and loading were going forward; if intrusted to a competent agency, the work would not involve such an exposure to danger, on the part of the vessel, as to involve deviation.

If a ship must be withdrawn from service every time that minor over-deck repairs are to be made, in order to avoid the assumption of the burdens of an insurer on the part of the carrier, some authoritative holding to that effect would be available. None has been found or cited.

Deviation has not been shown from the fact that the repairs were made.

■ Work began on June 7th, and had proceeded almost to completion, when fire broke out on the 15th, with the results to cargo heretofore stated.

It may be stated without further ado that the cause of the fire has not been established

by the evidence. True, the claimants' brief asserts that, because their witnesses were not in any position to know how the fire started, "a great latitude of imagination and deduction must be allowed"; but the extent to which the practice may have been resorted to is not disclosed.

The repairs were constantly being prosecuted during the interval referred to, and attention should be called to what was done in the immediate vicinity of No. 2 'tween decks. The forward bulkhead plate was cut by the use of the acetylene flame on the 10th, and on the same day the rivets of the angle or bounding iron were cut by the same process; that is, the rims of the upper projecting portion of the rivets were burned off. When the rivets were cool, they were punched in, as to three. The remaining two resisted the punching, and consequently the holes were never uncovered.

As to the three rivet holes, wooden plugs were at once inserted, to hold the plate in place, and to prevent the entrance of anything whatever into No. 2 'tween decks, immediately beneath.

Prior to the burning of these rivets on June 10th, the paraffin in No. 2 'tween decks was covered with tarpaulin, and a tub or pail of water was placed under the place at which the work was done. The second officer remained in this cargo space during the entire time involved, for safety's sake. As the fire did not occur until five days later, this particular detail of the repair may be disregarded as a factor of possible cause. On the same day, the hatch covers on No. 2 hatch were put in place, and covered with tarpaulin, to keep the heat of the sun out of this cargo space, so that the paraffin would not tend to melt. These several precautions are significant of the care and supervision employed while the repairs were going forward.

The old angle bar remained in place until the night of June 14th, when it was pried out of position and the new one put into place. At this time, the wooden plugs in the three holes were removed, to admit of the substitution of the new angle bar, and, as soon as that had been accomplished, the wooden plugs were redriven, and the vertical portion of the angle bar was bolted to the forward end of the bulkhead plating.

It was the intention to complete the task of fixing the horizontal flange of the angle bar in place, by employing tap rivets, i. e., rivets having a thread which would be screwed into place—cold. Because of the

fire, that was never undertaken. The wooden plugs above referred to were observed to be in place, when the fire was discovered, and the two rivets which had been sheared but not dislodged were still in place after the fire. Thus the five rivet holes are accounted for. The openings which they would have provided are the only means whereby agencies of combustion could have penetrated the main deck into No. 2 'tween decks, and no such entry is indicated by any testimony in the case.

On the morning of the 15th, just prior to the discovery of the fire, holes were being burned in the wash plate, at the forward end of the bridge deck, a matter of 7 or 8 feet above the main deck and not over the three holes plugged with wood, in the horizontal flange of the angle bar.

There is testimony by Razem, a fireman, presumably at his station in the engine room on the morning of the 15th, in answer to a leading question, that he saw men working with an oxyacetylene torch on the "bottom plates" near the No. 2 hold when he was on deck amidships on a brief errand, between 8 and 9 o'clock. This may be true, although his post of observation leaves something to be desired, but it does not help to establish the cause of the fire which was discovered an hour later, because a flame above deck would not account for combustion under the deck.

A workman noticed smoke coming from the after part of No. 2 hatch, and smelled something burning; the smoke was blue in color, and the odor was like oiled burnt rags. The first officer was notified, and he at once attempted to discover the true situation by opening a part of the hatch and lifting the tarpaulin. The second officer attempted to enter, but was driven back by dense smoke; discovery could not be made as to where the flames were, to port or starboard.

The foregoing are, in substance, the facts known concerning the fire. Speculation as to its cause would find no proper place in this opinion.

The contract for the repairs was let to one of the best shipbuilding and repair companies in Genoa, and the work that was done was that of the independent contractor, and not that of the petitioner. The evidence affords no basis to support a contention that there was negligence present in the performance of the repairs, on the part of either the independent contractor, or the petitioner.

The chief officer, observing the conditions revealed by the opening of the hatch,

closed it at once, and sought to smother the fire by closing the ventilators leading into No. 2 'tween and hold.

Within about ten minutes, taking an average of the testimony, the ship's hose was connected, and inserted in the No. 2 hatch, and thereafter a stream was projected into the hold. Shortly another hose was used in No. 3 'tween; other lines of hose from the shore, and fireboats were soon available, but the efforts to subdue the flames were not successful. The ship was moved into the outer harbor and beached in shallow water, and the fire probably burned itself out.

Much of the claimants' brief is devoted to the effort to establish insufficient fire equipment, on the part of the Salvore, to respond to the emergency, but no such finding would be justified. In the first place, the fire was so well advanced when the smoke was discovered that, unless the No. 2 hold could have been instantly flooded, the fire could not have been controlled.

The water service line on the bridge deck was cut off for a few feet, needing replacement, but the exposed end was plugged; hose was coupled at a valve about amidships, and water was pumped through that hose into No. 2 hatch, as has been stated. The pumps were adequate; steam was in one boiler, of a sufficient head to operate the pumps, and they did so function as to supply all the water that the pumps were designed to operate. There were sufficient lengths of hose in good condition to meet expected requirements. If these things had not been true, the ship would not have enjoyed her classification.

The fact, that fire drills had not been held on the eastward voyage, does not account for the range and intensity of the fire, or for its devastating effect.

Hines v. Butler (C. C. A.) 278 F. 877, 878, is cited in this connection, in behalf of the contention that the petitioner is not entitled to the benefit of the fire statute. In that case, a disastrous fire occurred on a vessel plying between Norfolk and Baltimore, resulting in loss of life as well as cargo. The opinion includes the following statement: "From the testimony it appears that there was an entire lack of fire apparatus in proper condition to fight the fire, and also great lack of discipline and proper conduct on the part of the crew. None of the fire apparatus could be used. * * * there was presented a most disgraceful condition in the necessary arrangements to protect the ship and passengers in case of fire, and the neces-

sary discipline and order which should exist for the removal of passengers from a ship threatened with destruction by fire."

No such lack of discipline, no such failure to employ apparatus, and no such lack of condition of apparatus are shown in this record.

It is urged that obedience to local regulations would have required the removal of the paraffin from No. 2 'tween decks before the repairs were undertaken. This is not established, but, if it were the fact, there is no evidence tending to show that the fire started in the paraffin.

Again, it is urged that, because vessels of United States registry are required to maintain a system of steam pipes for smothering fire below decks, this petitioner is not entitled to the benefit of the fire statute, so-called. This argument is not considered, because the contract of the parties, evidenced by the bills of lading, includes the substance of the said statute, and no reason has been shown for holding that the contract was departed from by the petitioner.

Incidentally it is urged that the printing ink stowed in the bridge deck space was really under-deck cargo and, as to it, the petitioner was an insurer. The surveyor who testified on this subject said that the bridge deck space on this vessel, when leaving New York, was suitable for liquid cargo in drums.

The Sarnia, supra, cited in this connection, is not in point.

It may be assumed, without so deciding, that the Columbus Marine Agency, in New York, and Desimoni, in Genoa, were sufficiently clothed with authority, as agents of the petitioner, to visit upon the latter the neglect, privity, or knowledge of the former. There would of necessity remain to determine what neglect has been shown on the part of the respective agents.

Knowledge by them of the nature and stowage of the cargo, of the collision damage, and of the necessary methods to be pursued in effecting the repairs, may be freely conceded, but no conclusion can be drawn therefrom of a helpful nature to the claimants, for reasons which it has been the effort herein to set forth.

The claimants urge, in conclusion, that, as to certain of them, a general average award would be proper. The voyage did not end in the port of New York, but in Genoa, where it is believed that general average appropriately may be stated.

Not all of the arguments made by the claimants have been herein discussed, and much of the testimony which has been examined cannot be referred to without unduly extending that which is now too long.

The evidence is believed to establish a fire which was caused without the design or neglect of the petitioner, and accordingly it is entitled to exoneration with costs.

If the foregoing be deemed an insufficient compliance with Admiralty Rule 46½ (28 USCA § 723), findings and conclusions may be settled on notice.

Settle decree on notice.