## THE TREGENNA.

### HAIN S. S. CO., Limited, v. FARR et al.

District Court, S. D. New York.
Sept. 26, 1940.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (L. DeGrove Potter and Joseph W. Whelan, both of New York City, of counsel), for Hain Steamship Co., Limited.

Forrest E. Single, of New York City (Wilbur H. Hecht and Douglas D. Crystal, both of New York City, of counsel), for Farr & Co.

CONGER, District Judge.

These two proceedings were tried together. The first is the petition of Hain Steamship Company, Ltd., owner of the steamship Tregenna for exoneration from and limitation of its liability. Farr & Com-

pany, the only claimants, seek to recover for loss of and damage to sugar loaded on the Tregenna at Casilda and Santiago, Cuba. The loss and damage claimed were the result of the vessel's stranding after leaving San Pedro de Macoris, San Domingo.

The second suit is by the petitioner against Farr & Company, to recover the balance of freight on that portion of the sugar loaded in Cuba which was carried to destination after the stranding at San Pedro in another vessel, the Baron Dalmeny, chartered by the petitioners for that purpose.

Farr & Company, among other things, claim that the vessel deviated after sailing from Santiago and because of that deviation petitioner has lost the benefit of its contract.

The same question came before the House of Lords in England, in a suit by the consignee of the sugar carried by the Tregenna on this voyage, to recover back general average deposits (Hain S.S. Co., Ltd., v. Tate & Lyle, Ltd., 155 L.T. 177; 41 Com.Cas. 350; 52 LL. L. 159). The House of Lords held that Farr & Company, the claimants herein, by continuing the performance of the charter after knowledge of the alleged deviation, waived the deviation.

It is alleged in the claim and answer of Farr & Company that the vessel was unseaworthy because among other things she was not equipped with proper charts and with a pilot. In the English proceeding these charges were also alleged, but either before or during the trial were withdrawn. This feature of the case, however, is in issue herein.

Farr & Company is a firm of sugar dealers and brokers doing business in New York City. On July 16, 1930, Farr & Company through their steamship brokers, Messrs. W. W. Battie & Co., Inc., a New York corporation, entered into a voyage charter or contract of affreightment with the owners of the Tregenna, Hain Steamship Co., Ltd., through Foster, Hain & Read, Ltd., Managers. The charter party was signed at New York on a New York Produce Exchange Steam Sugar form; Simpson, Spence & Young of New York signing for the owners of the Tregenna, by cable authority received on the same day from their London office.

The charter party recited that the Tregenna was then at Kingston, Jamaica; that she was seaworthy and fitted for voyage; and that she would proceed to Cuba and there load at one or two ports on the north side or one or two ports on the south side, as designated by the charterer, and at one safe port on the south side of San Domingo, as ordered by the charterer; that the cargo was to be received "from the Factors of the said charterer", and to consist of a full and complete cargo of sugar in bags not exceeding 7,700 net tons nor less than 7,030 net tons. The vessel, so laden, was to proceed to one safe port in the United Kingdom or in the Bordeaux-Hamburg range, one port only, at charterer's option and designation. The charter also provided that the stevedores were to be recommended by the charterer's agents but at the ship's risk and expense; bills of lading were to be signed for by the master in accordance with mate's receipts on an approved form at such rates as might be required by the charterer but without prejudice to the charter party; lay days were to be at the rate of five hundred tons per weather working day at loading ports; demurrage, if any, was payable by charterers at the rate of six cents per net registered ton, or $192 a day; owners in turn were to pay dispatch money at the rate of $96 a day.

The charter provided that specified commissions were to be paid to the respective brokers and that "charterer's nominee to do steamer's business at loading ports, owners paying agency fee of $75.00 if one port of loading used or $50.00 at each port if two ports of loading used."

On the same day, July 16th, instructions were given to the ship's New York brokers, Messrs. Simpson, Spence & Young (designated as "Arrow" in the English proceeding), by charterer's brokers W. W. Battie & Co., Inc., that the first port of loading in Cuba was to be Casilda, where the captain should report to Messrs. Iturralde & Arguelles for cargo. The same communication advised Messrs. Simpson, Spence & Young that the second port of loading was to be Santiago de Cuba, where the captain was to report to Messrs. Wetmore & Bucher for cargo. The next day, July 17th, Messrs. Battie & Co. advised Messrs. Simpson, Spence & Young that the third port of loading was to be San Pedro de Macoris in San Domingo, the captain to report there to Messrs. Tatem & Co., for cargo. On the same day, July 17th, Messrs. Simpson, Spence & Young cabled to the Tregenna, care of Iturralde & Ar-

guelles, at Casilda, as follows: "Second Port Santiago Apply Wetmore Bucher Third Port Sanpedromacoris apply tatem company telegraph amount required disbursements each port will cable funds acknowledge."

There is no telegraph office at Casilda, Cuba, but there is one in the nearby town of Trinidad. It appears that the telegraph agent at Trinidad gave the above quoted telegram from Simpson, Spence & Young to a colored chauffeur who was going to Casilda and who was to deliver it to the captain. Neither the captain nor Iturralde & Arguelles ever received this telegram. No reply was ever received to the telegram; no follow up message was sent nor confirmation forwarded by mail. No steps were taken to trace the telegram or to confirm its ultimate disposition until after the vessel had sailed from Santiago.

Iturralde, on July 19th, received a letter from Messrs. Mendoza e Cia, of Havana, Farr & Company's correspondents, advising that the Tregenna was to proceed from Casilda to Santiago de Cuba and there report to Messrs. Wetmore & Bucher. These instructions were passed on to Captain Cordy of the Tregenna. Accordingly, after loading 12,693 bags of sugar weighing 1,867 net tons for Farr & Company at Casilda, the vessel sailed early in the morning of July 24th for Santiago de Cuba.

In the meantime, on July 18th, Messrs. Simpson, Spence & Young had mailed a copy of the charter party from New York to Captain Cordy at Santiago care of Wetmore & Bucher, and its receipt was acknowledged by the captain on July 26th.

The vessel lifted 21,730 bags of sugar weighing 3,123 net tons for Farr & Company at Santiago, completing her loading in the morning of July 29, 1930. Wetmore & Bucher had received instructions from Farr & Company that the vessel should be cleared not later than July 29th and this clearance was effected. Some overtime for charterer's account had to be worked, however, in order to clear her in time.

Captain Cordy, in the absence of further instructions as to the third port of loading, cleared the vessel with 4,990 tons of cargo and 2,040 tons of dead space from Santiago de Cuba for Queenstown via Norfolk for bunkers.

The captain did not wait out his lay days at Santiago nor did he communicate with Simpson, Spence & Young, Farr & Company, Mendoza e Cia, her owners or anyone else for the purpose of obtaining further instructions, before sailing underladen, except that he did inquire of Wetmore & Bucher, the agents at Santiago, whether they were positive that Santiago was the last loading port, and he did protest that he had only a partial cargo and he took steps to insure the collection of dead freight at Queenstown. To do this he made the following notation upon the Santiago bills of lading:

"Total loaded Casilda and Santiago 4990 net tons
"Minimum as per charter party 7030 net tons
"Dead freight to be paid on 2040 net tons
"(Signed) C. Cordy
"Master."

It is significant that neither the agents, Wetmore & Bucher, nor the captain made any inquiries by cable to Simpson, Spence & Young in New York, to Farr & Company, or the "Single Seller" (Agencia Co-operative de Exportacion de Azucar, seller of the Cuban sugar loaded aboard the Tregenna) for instructions as to the shortage. Inasmuch as the cargo shipped at Casilda and Santiago left a shortage of over 2,000 tons, required by the charter, and involving a heavy claim for dead freight, it is all the more significant, when it is considered that both the captain and Wetmore & Bucher had a copy of the charter showing that the ship was to go to a third port in San Domingo to be ordered.

In the meantime, Farr & Company had entered into an agreement in a form of a sub-charter with the Cuban Dominican Sales Corporation whereby the latter corporation was given the right to load sugar on board the Tregenna at a safe port on the south side of San Domingo. The amount of such cargo was not to exceed 2,780 tons, nor to be less than 2,040 tons, thus providing for a full ship after the vessel had loaded not more than 4,990 tons for Farr & Company at Cuban ports. Farr & Company arranged with Cuban Dominican Sales Corporation for the sub-charter at the time it negotiated for the original charter for the Tregenna with the ship's agents, Simpson, Spence & Young. The sub-charter was not actually signed until July 28, 1930.

When the Tregenna sailed from Santiago, Wetmore & Bucher wired Simpson, Spence & Young in New York, Mendoza & Co., at Havana and the shipowner in

England, advising that the Tregenna was sailing for Queenstown for orders with only 4,990 tons of cargo on board. Mendoza & Co., on July 29th, cabled this information to Farr & Company, who made no protest or objection. Simpson, Spence & Young received a cable of inquiry from the owners as to why the vessel had not been fully loaded, and Simpson, Spence & Young thereupon wired Wetmore & Bucher advising that the vessel should have gone to San Pedro de Macoris. A similar wire was sent by the owners to Wetmore & Bucher at Santiago. Wetmore & Bucher immediately sent a wireless to the master of the vessel to proceed to San Pedro de Macoris and so advised Simpson, Spence & Young, requesting them to endeavor to reach the master also. Simpson, Spence & Young sent a radio to the master, but before it was dispatched from Florida, they received a radio from the master to the effect that he had turned back and was going to San Pedro de Macoris and they cancelled their radio.

The master received the wire of Wetmore & Bucher about noon on July 30th, by which time the vessel had proceeded some 28 hours on her way north from Santiago to Norfolk. The deviation, according to the master, was an increase of 265 miles beyond the normal voyage from Santiago to San Pedro. Later in the afternoon of the 30th the master received radio instructions from Simpson, Spence & Young to report to Messrs. Tatem & Co., at San Pedro.

Farr & Company was advised the vessel had cleared for Queenstown and of the fact that the vessel had been sent back to San Pedro. Farr & Company gave no instructions to anyone to have the vessel recalled or ordered to San Pedro. Farr & Company was not advised officially of the vessel's arrival at San Pedro until some hours after loading had commenced there. Tatem & Co. did not report to Farr & Company, but reported to Simpson, Spence & Young. They received no instructions from Farr & Company.

At San Pedro about 2,789 tons of sugar were loaded under the sub-charter under the supervision of Tatem & Co., who had been named by Farr & Company under the terms of the charter.

When Captain Cordy first sailed from Santiago, he cleared for Queenstown and he did not intend to go to San Pedro. He had on board no proper charts covering this harbor. This fact Captain Cordy admitted when examined regarding the accident. Going into San Pedro he employed a pilot. In San Pedro he procured a U. S. Hydrographic Office chart of the harbor. This was a 1925 chart, corrected to July 16, 1927. The particular chart Captain Cordy had was not corrected to the date of the accident, although corrections had been issued by the Hydrographic Office in 1929. Captain Cordy was advised by a pilot at San Pedro that one of the channel buoys was out of place, yet he made no corrections on the chart.

On August 6, 1930, after the vessel had completed loading at San Pedro she sailed for Queenstown. She left port without a pilot. Before she had cleared the headlands at the harbor entrance the vessel struck some underwater obstruction and stranded, with resulting serious damage to the vessel and to the Cuban sugar which was in the lower holds. The vessel sailed at 5:34 P. M. and at 5:50 was hard aground. The damage to the vessel was such that the entire cargo had to be discharged. The sound cargo was sent forward to destination by another vessel, the Baron Dalmeny, procured by the owners of the Tregenna for that purpose. The Tregenna proceeded in ballast to Mobile for examination and temporary repairs, and later to Newport News, where permanent repairs were effected.

The claimant Farr & Company contend that the Tregenna deviated from its agreed voyage: First, in sailing from Santiago to Queenstown instead of going direct to San Pedro de Macoris; and, second, in going back to San Pedro after receipt of radio instructions.

Although petitioner denies that there was a deviation, nevertheless, there is little question but that the Tregenna did deviate. The English judges who passed upon this case in the House of Lords and the English Court of Appeals found that the vessel had deviated. The only English Judge who did not find that the vessel had been guilty of deviation, Justice Roche, of the King's Bench Division, expressed the view that the obligation to give notice to the master of the vessel of the intended ports of call was the charterer's and that their failure to see that the notice actually reached the master excused the deviation. However, he was overruled by both the Court of Appeals and the House of Lords.

From the facts before me I am in agreement that there was a deviation. Lord Justice Scrutton of the English Court of Appeals, in his opinion on the question of deviation, goes at great lengths into the facts. I am in entire accord with his findings on this branch of the case. It might be well, at this time, to quote from his opinion the following pertinent extracts (Tate a Lyle, Ltd. v. Hain Steamship Co. Ltd.; Judgment of the Court of Appeal [England], dated May 17, 1934):

"Assume the charterer, a single person, contracts to provide a cargo at a port which he is to order and says to the shipowner within a reasonable time: 'I order port A', what more has the charterer to do? It is not his business to forward that order to the ship, or see that the ship executes it. The shipowner has to do what he is ordered to do, which he has contracted to do. If he employs an agent to pass on the order to the ship, and the agent fails to do so, the shipowner has no excuse for not doing what he has contracted to do, 'proceed to a port as ordered'. It appears to have been argued in giving the order to proceed, to the New York branch of the shipowner's chartering broker, the charterer did not effectively give any order. I do not understand this. 'Arrow' (cable address of Simpson, Spence & Young, ship's agents in New York) accepted the order and purported to act on it, and the shipowners accepted 'Arrow' as their agent. If I understand the learned Judge, if Farr had given the order for the third port to the shipowner in London in time for the shipowner to communicate by telegraph and by letter with the captain, and the wire and letter had both gone astray in transmission, the risk, in the Judge's opinion, would have been the charterer's.

"It seems, however, to me there was in this case default or neglect on the part of the shipowners' agents. As to 'Arrow', whom the shipowner accepts as his agent, 'Arrow' did not follow the usual course of repeating and confirming in his letter of the 18th July his cable of the 17th July ordering San Pedro de Macoris as the third port. If he had done so this deviation would never have taken place. But, as I regard this as vital, 'Arrow' never sent any instructions as to the third port to the ship's agents at Santiago, who, it is true, had the charter, but not the nomination of the Dominigan port which was to be the third port. As to the Master, he had the charter at Santiago, but either did not read it or did not understand it, and took no steps to ascertain what was the third port. As to Wetmore & Bucher, who, though nominated by the charterers, were employed by the ship, and who had the charter, I cannot think they acted reasonably in dispatching the ship to England with an incomplete cargo, in the absence of instructions, and without inquiring what was the position as to the third port and the rest of the cargo. Some attempt was made to justify the action at Santiago by saying that the charterers must have known of the error when their agents, Wetmore & Bucher, ordered the ship to Macoris and they supplied cargo there, and this must be taken to be a waiver of the deviation, if any, which binds the indorsees of the bill of lading. This argument was, however, conclusively negatived in the well-known case of Leduc v. Ward (Vol. 20, Queens Bench Division, p. 475)."

However, petitioner Hain Steamship Company, Ltd., contends that even assuming there were any deviation, it was waived by claimants Farr & Company, who, by their acts, elected to affirm and ratify the charterparty and are estopped from claiming that the vessel deviated. This contention on the part of the Hain Steamship Company, Ltd., follows the decision of the House of Lords, who overruled the English Court of Appeals.

Farr & Company contend, on the other hand, that the American law on the effect of deviation is different from the law of England, as expressed by the House of Lords, and that therefore the decision of the House of Lords should not be followed.

This case and particularly this branch of it, presents a rather troublesome question.

On the question of waiver, the English courts were at variance. The Court of Appeal found that there had been no waiver, but the House of Lords found otherwise. Lord Justice Scrutton, who wrote the opinion for the Court of Appeal, is a recognized authority on questions of this nature. His book on charterparties (Scrutton on Charterparties and Bills of Lading) is a well known work, not only in England but in this country as well. His opinion is quoted above. The House of Lords has found, on the identical facts present here, that there was a deviation but that the deviation was waived.

■ I am mindful that decisions of the House of Lords in England are entitled to and given the greatest respect by the courts of this country, and are universally followed, particularly in maritime controversies. A decision on identical facts by the House of Lords ordinarily would be considered the highest authority and followed.

However, a careful reading of the many decisions in the American courts on this subject has convinced me that the decision of the House of Lords is not in accordance with American law.

Under American decisions, it has been held that a shipper, upon a deviation by a ship, has the right either to rescind the contract of shipment or charterparty and treat the goods as converted by the deviator, or to accept the goods, holding the ship responsible for damages subsequent to the warranty broken.

In passing on this question in the case of The Citta Di Messina, D.C., 169 F. 472, 475, the Court used the following pertinent language: "That the carrier by deviating from a voyage described alike in insurance policy and bill of lading, has broken the warranty not to deviate, thereby terminated his own insurance, and given the shipper a right either to rescind the contract of shipment and treat the goods as converted by the deviator, or to accept the goods, holding the ship responsible for damage subsequent to warranty broken, without any reference to the question whether the deviation had any bearing on the particular loss complained of." See also Cohn v. United States Shipping Board, 6 Cir., 20 F.2d 56; R. B. Boak & Co. v. United States Shipping Board, 5 Cir., 11 F.2d 523.

■ Thus, when a ship makes an inexcusable deviation (the only deviation allowed under the within charterparty was for saving or attempting to save life or property at sea), the ship becomes liable as an insurer for any damage to the cargo. St. Johns Corp. v. Companhia Geral, etc., 263 U.S. 119, 44 S.Ct. 30, 68 L.Ed. 201; The Willdomino, 272 U.S. 718, 47 S.Ct. 261, 71 L.Ed. 491; The Sarnia, 2 Cir., 278 F. 459; The Citta Di Messina, supra.

The decisions in this country seem to be entirely at variance with the rule laid down in the House of Lords. The English courts held that Farr & Company had waived the deviation because it had permitted the vessel to load the sugar under the sub-charter at San Pedro and by so doing recognized the substitution of the charter contract and hence waived the unjustified deviation. On the theory of having recognized the contract as still existing after the deviation, it could not therefore on the one hand recognize the contract as alive and in being, and at the same time collect damages for the alleged breach. As was stated by Lord Atkin, of the House of Lords: "A breach of such a serious character that, however slight the deviation, the other party to the contract is entitled to treat it as going to the root of the contract and to declare himself as no longer bound by any of its terms * * *. But, on the other hand, as he can elect to treat the contract as ended, so he can elect to treat the contract as subsisting and if he does this with knowledge of his rights he must in accordance with the general law of contract be held bound."

■ However, as heretofore stated, a careful reading of the many decisions in American courts on this subject convinces me that the rule is different in this country. The decisions seem almost unanimous in holding that under these circumstances a shipper either has the right to cancel the contract and treat the goods as converted, or accept the goods and hold the ship responsible for the damages subsequent to the warranty broken. On this precise point the English point of view and the American point of view differ radically.

■ The petitioner raises the point however, that in all of the American cases cited above, the loss was occasioned by the actual deviation itself, that is, the delay caused the damages, while in the instant case, the cause for the loss was independent of the deviation, that is, the stranding was the proximate cause. However, I believe the American law is well settled that when a deviation takes place, and the shipper affirms the contract, thus preserving his rights because of the deviation, the shipowner becomes an insurer of the cargo, liable for all damages subsequent to the warranty broken, without any reference to the question whether the deviation had any bearing on the particular loss complained of. In fact this precise point was so stated in Niles-Bement-Pond Co. v. Dampkiesaktieselskabet Balto, 2 Cir., 282 F. 235, at page 237, where the court said in discussing Calderon v. Atlas S.S. Co., 170 U.S. 272, 18 S.Ct. 588, 42 L.Ed. 1033: "Ac-

cordingly the court held the vessel liable for the full value of the cargo, even though lost in a hurricane which, under another provision of the bill of lading, would have exempted the carrier from liability had there been no deviation. Since, under our decision in the Sarnia Case, supra [2 Cir., 278 F. 459], a failure to carry as required by the terms of the bill of lading or a deviation of the voyage gives the shipper the right to consider the goods as converted by the deviator, and the ship responsible for damages due to breach of the contract of carriage, without any reference to the question of whether the deviation had any bearing on the particular loss complained of, the carrier here must be held for the full damages flowing from the breach." See, also, The Citta Di Messina, supra, 169 F. at page 475.

The petitioner places great weight on the cases of The Henry W. Cramp, D.C., 6 F.2d 900 and the Sidney Blumenthal & Co. v. United States, D.C., 21 F.2d 798. I am of the opinion that these cases are not controlling on the within question. Furthermore, these cases are not considered the weight of authority in the United States. See discussion of these cases in The Pelotas, 5 Cir., 66 F.2d 75, at page 77.

Accordingly, even though the proximate cause of the damage was the stranding, entirely independent of the deviation, the court must hold that Farr & Company is entitled to an interlocutory decree for damages to the sugar loaded prior to the loading at San Pedro de Macoris, with the usual reference to prove its damages.

There is no definite proof that the loss herein was occasioned or incurred with the privity or knowledge of the owner of the vessel, the Hain Steamship Company, Ltd. Therefore, petitioner's application for a limitation of liability is granted.

Because of my holding herein, I have not considered Farr & Company's charges and proof that, in addition to the deviation, the steamship Tregenna and her owners are also liable for the loss sustained because the stranding of the Tregenna was due to the negligence of the master and that the vessel was unseaworthy, both when sailing from Santiago, in that the vessel did not have on board proper and sufficient charts covering the port of San Pedro de Macoris, and when sailing from San Pedro de Macoris, in that she was without a compulsory pilot on board and hence was improperly manned, equipped and supplied and that the master was not competent to navigate in the harbor of San Pedro de Macoris without the aid of a licensed government pilot.

As to the second case, there is no serious question but that Farr & Company owe the shipowners for the freight for the voyage in question. I therefore direct that a decree be entered in favor of the Hain Steamship Company, Ltd., for the freight due and owing, but, inasmuch as the damages accruing to Farr & Company herein will far exceed the freight owed to the vessel, it is decreed that this sum shall be surrendered by the Hain Steamship Company, Ltd., as part of the limitation fund herein.

If this opinion is not in sufficient compliance with the rule requiring findings of fact and conclusions of law, then, submit, on notice, findings of fact and conclusions of law in accordance therewith.