336 F.2d 416
 CARGO & TANKSHIP MANAGEMENT CORPORATION, as agents for American Tramp Shipping Development Corporation, bareboat owners of the S.S. MOUNT EVANS, Libelant-Appellee,
v.
INDIA SUPPLY MISSION and the President of India, Respondents-Appellants,
v.
UNITED STATES of America, Respondent-Impleaded-Appellee.
 No. 475.
 Docket 28791.
 United States Court of Appeals Second Circuit.
 Argued May 27, 1964.
 Decided August 28, 1964.
 
 Healy, Baillie & Burke, New York City (Sirius C. Cook, New York City, of counsel), for libelant-appellee.
 Webster, Sheffield, Fleischmann, Hitchcock & Chrystie, New York City (Carolinda Waters, Stephen C. Kaye, New York City, of counsel), for Theodore W. Kheel and Raymond J. Scully, Trustees of American Tramp Shipping Development Corp.
 Baker, Nelson, Williams & Mitchell, New York City (O. Taft Nelson, Robert M. Atkinson, New York City, of counsel), for respondents-appellants.
 John W. Douglas, Asst. Atty. Gen., Robert M. Morgenthau, U. S. Atty., Morton Hollander, Chief, Appellate Section, Civil Div., Louis E. Greco, Atty. in Charge, New York Office, William H. Postner, Atty., Admiralty & Shipping Section, Dept. of Justice, for respondent-impleaded-appellee.
 Before LUMBARD, Chief Judge, and WATERMAN and HAYS, Circuit Judges.
 WATERMAN, Circuit Judge:
 
 
 1
 This is an appeal from a final decree and judgment in admiralty, wherein the libelant, the Cargo & Tankship Management Corporation, sought to recover from the respondents, the India Supply Mission and the President of India, freight and demurrage alleged to be due libelant for having transported a cargo of wheat from the United States to India, and wherein the named respondents, who denied liability, impleaded the United States as a respondent on the theory that if it were found that they were indebted to the libelant for freight and demurrage they were entitled to an indemnification from the United States. The United States District Court for the Southern District of New York granted summary judgment in favor of libelant against the named respondents, but denied the respondents' motion for summary judgment against the impleaded respondent for an indemnification, and the respondents have appealed. The opinion below is reported at 221 F.Supp. 680.[1] We affirm the lower court's grant of summary judgment in favor of the libelant, but we reverse the denial of the respondents' motion for summary judgment against the impleaded respondent and remand for further proceedings.
 
 
 2
 On March 2, 1962, libelant and respondents entered into a voyage charter party, under which libelant's United States flag vessel, the S. S. Mount Evans,[2] was to carry a cargo of wheat from one safe United States gulf port to two safe ports in India at a freight rate of $28 per long ton. A cargo of 10,150 tons of wheat was subsequently loaded at Galveston, Texas, and on May 23, 1962, the Mount Evans set out on her voyage to India. Seven days later a crack which had developed in the ship's hull forced her to put into Hampton Roads, Virginia, for repairs. She set out again on June 2, 1962, but was forced to return to Newport News, Virginia, the following day because of a very serious leak in her hull and shaft alley. The Mount Evans was then removed to Norfolk, Virginia, where, all appearances being that it would require some time for necessary repairs, her officers and crew were signed off and her cargo of wheat bound for India was discharged between June 7 and June 25 into grain elevators.
 
 
 3
 On June 29, 1962, libelant and respondents entered into a second written agreement, under which they agreed, after reciting the unfortunate travails of the Mount Evans, that "to save expenses" the libelant would forward the cargo of wheat on the S. S. Christitsa, a foreign flag vessel, with libelant to bear the cost of discharging the cargo from the Mount Evans, and with "the forwarding to be done without the charging of additional freight." Respondents agreed to make certain concessions with respect to the General Average claim, and the written agreement concluded with a statement that it "shall not be construed as an admission of liability or as a waiver of any of the rights of the parties hereto under the original Contract of Affreightment." Pursuant to the agreement, the cargo of wheat, now amounting to only 9,950 tons due to handling loss, water damage, and the leaving of a small quantity in the Norfolk grain elevators, was loaded into the Christitsa, the chartering of which cost libelant a modest $80,985, and the vessel departed Norfolk on July 12. Arriving at its first India port on August 28, she duly discharged the 9,950 tons of wheat. When respondents refused to pay libelant the freight and demurrage claimed to be due, libelant brought this action below and recovered a judgment of $286,273.07, a sum representing freight charges calculated at $28 per ton, plus $12,633.07 for demurrage and less an agreed credit for late arrival of $4,960.
 
 
 4
 The involvement of the United States in these proceedings stems from the fact that the wheat transported was United States surplus grain which India had purchased from this country under the provisions and regulations of Title I of the Agricultural Trade Development and Assistance Act of 1954, 7 U.S.C. §§ 1701-1709, commonly known as Public Law 480, a statute designed to facilitate trade with friendly nations through the sale of quantities of this country's surplus agricultural products to those nations, payment to be made in the purchasing nations' own currencies. Broadly speaking, Public Law 480 and the regulations thereunder provide that the United States will reimburse a purchasing country, if there is a compliance with the applicable regulations, for any additional ocean freight charges the purchasing country has incurred in shipping the purchased products in American flag vessels instead of in less expensive foreign flag vessels. Here, although transportation arrangements as originally made contemplated shipment of the purchased wheat from a United States Gulf of Mexico port to India on an American flag vessel, the wheat was carried from Norfolk, Virginia to India in a foreign flag vessel without the knowledge or express consent of the United States.
 
 
 5
 Prior to making arrangements for the ocean transportation of the wheat, India procured from a division of the United States Department of Agriculture "ocean transportation authorizations" which provided for the procurement of ocean transportation, and for reimbursement therefor by the Agriculture Commodity Credit Corporation (CCC) if the wheat were shipped in an American flag vessel and if the supplier of transportation certified that such a vessel was to be used. Respondents then entered into the above described voyage charter party with libelant, it being stated in the charter party that the contract was subject to all the regulations and provisions of Public Law 480, and then the agreement was approved by the CCC in three "Advices of Vessel Approval," which, after naming the S. S. Mount Evans as the vessel approved, recited the following statement: "Ocean freight to be financed by CCC. Notice of arrival is required." Various other regulations issued pursuant to Public Law 480 also provided for the giving of a notice of arrival by the purchasing country; admittedly respondents gave none in the present case because the approved vessel, the S. S. Mount Evans, never arrived, the wheat being transshipped from Norfolk, Virginia, to India in the foreign flag vessel S. S. Christitsa. The applicable regulations also provided, in 7 C.F.R. § 11.12(c) (2), that: "In the case of transshipment from a United States-flag vessel to a foreign-flag vessel, the cost of ocean freight from the port of transshipment to the importing country will not be financed by CCC."
 
 
 6
 We first consider libelant's claim against respondents for freight charges at the rate of $28 per ton plus demurrage, and we agree with the court below that the undisputed material facts which were established upon the summary judgment motion confirm that respondents are liable to libelant for such charges. Respondents' contention that the S. S. Mount Evans was so unseaworthy when she began her ill-fated voyage that the docking at Norfolk for repairs was a voluntary deviation from her intended course, while admittedly presenting issues which can be sufficiently resolved only through a full trial, nevertheless, under the circumstances of this case, is legally irrelevant to the question of respondents' liability for the claimed freight and demurrage charges and hence constituted no bar to the lower court's grant of summary judgment against respondents.
 
 
 7
 A proper analysis of this facet of the case must begin with a determination of the undertakings the parties contemplated in the June 29 agreement, wherein libelant agreed to provide for the transshipment of the wheat from Norfolk to India aboard the vessel S. S. Christitsa "without the charging of additional freight." We think it clear that the June 29 agreement, which contained this language and which referred to the events that had recently transpired pursuant to the March 2 charter party, bound libelant to transship the cargo of the S. S. Mount Evans to India aboard the S. S. Christitsa, and bound respondents to pay to libelant for this shipment freight charges at the $28 per ton rate originally agreed to in the charter party of March 2. Respondents have attempted to persuade us that, since the June 29 agreement spoke only of there being no charge for additional freight and did not expressly state a lower rate, it did not contemplate the original charter party rate but some different unexpressed rate. We are unconvinced. Only the most forced reading of the June 29 agreement, a reading which would ignore commercial realities generally as well as the particular circumstances of these parties, would justify us in holding that these parties intended such contractual ambiguity. We think that the clear intendment of the June 29 agreement, drawn from its plain language and the circumstances leading up to it which were recited in it, was that the wheat was to be transshipped to India at the same freight rate set forth in the charter party of March 2, and certain additional obligations were to be assumed by the parties in connection with the discharge of the cargo from the S. S. Mount Evans and the General Average expenses. Moreover, we note in passing that, despite respondents' insistence that the freight rate term of the June 29 agreement was so vague and incomplete as to require resort to extrinsic evidence to determine its meaning, they did not below and do not here point to or describe just what extrinsic evidence they can offer in support of their interpretation of this agreement, and indeed what extrinsic evidence there is — such as the freight rate on the bills of lading — which might provide clarification if clarification were needed, supports the very interpretation which respondents seek to avoid.
 
 
 8
 The June 29 agreement providing, then, for transshipment at the original charter party rate of $28 per ton, we have difficulty in fully understanding respondents' argument that the unexpected docking at Norfolk which gave rise to the June 29 agreement permits them to escape payment of these freight charges. The contention is that the S. S. Mount Evans was in such an extremely unseaworthy condition when she left Galveston that her subsequent docking at Norfolk for repairs must be deemed to have been a voluntary deviation from her planned course and, as a consequence, respondents may now escape payment of the freight charges alleged to be due. Respondents maintain that this defense arose at the time of the deviation, and was reserved in the June 29 agreement under the provision that "this agreement shall not be construed as an admission of liability or as a waiver of any of the rights of the parties hereto under the original Contract of Affreightment." But to construe this clause so as to permit respondents to avoid the freight charges of $28 per ton, when in the very same agreement the parties covenanted for transshipment — a transshipment caused by the deviation now relied upon as the basis for not paying the charge — at that same $28 per ton rate, would be to attribute to the parties the making of an agreement so contradictory as to be commercially meaningless. We think it more reasonable to interpret this saving clause as the lower court also apparently interpreted it, as only relating to such matters as General Average expenses, damage to cargo, and loss occasioned by delay. More importantly, however, the fact remains that respondents got what they bargained for in the June 29 agreement as it amended the March 2 charter party — delivery of the wheat to India — and should not be permitted to escape paying the agreed freight charges for such delivery. Cf. Farr v. Hain S. S. Co., 121 F.2d 940 (2 Cir. 1941). For this reason we fail to see how the various deviation cases cited to us by respondents, which involved either nondelivery or damage to cargo, are relevant. The Malcolm Baxter, Jr., 277 U.S. 323, 48 S.Ct. 516, 72 L.Ed. 901 (1928); The Willdomino v. Citro Chem. Co., 272 U.S. 718, 47 S.Ct. 261, 71 L.Ed. 491 (1927); The Waalhaven, 36 F.2d 706 (2 Cir. 1929). Certainly if the S. S. Mount Evans had deviated to Norfolk because of extreme unseaworthiness but had been completely repaired so that the June 29 agreement between these parties provided for the completion of the voyage by that vessel, or if the wheat had been transshipped in an American flag vessel under the June 29 agreement so that respondents would have complied with the terms of their separate contract with the United States, we would not permit respondents to escape payment of the freight charges after due delivery of the cargo. Why, then, should the result be any different because these respondents, by agreeing to transshipment in a foreign flag vessel, have, as explained infra, lost reimbursement rights on a separate remuneration contract? While respondents now stand to suffer a substantial financial loss which they could have avoided, and while libelant has turned a tidy profit by transshipping in a low rate foreign flag vessel, these results arise from respondents' own doing, stemming from their decision, in order to secure prompt delivery of their wheat, to permit transshipment in the foreign flag vessel libelant offered on June 29. For much the same reason we also reject respondents' argument that, if it can be shown that the unseaworthy condition of the S. S. Mount Evans was so serious as to make fraudulent libelant's promise to sail it to India, any loss to respondents of reimbursement for freight charges they must pay because of shipment in a substitute vessel are recoverable damages resulting from that fraud.[3] This ignores the real cause of the loss by respondents of their right to reimbursement under their separate contract with the United States, which was their own decision to accept transshipment in a foreign flag vessel without first contacting the Department of Agriculture as to the effect this decision of theirs would have upon their rights under the separate contract of reimbursement. Respondents could have elected to require transshipment in an American flag vessel, or they could have elected to arrange for some alternative method of shipment if they believed libelant's deviation permitted it, but, instead, they elected to transship in a foreign flag vessel despite the plain conditions of their arrangement for reimbursement with the United States, and hence respondents cannot now be heard to complain over the loss of their right to the reimbursement.
 
 
 9
 The lower court also determined that respondents were entitled to no reimbursement from the United States for the amount found to be owing to libelant, and, as to the freight charges for transshipment from Norfolk to India, we agree with this decision of the lower court. The contract of reimbursement executed by the United States, and the departmental regulations governing such an agreement, clearly stated that reimbursement was to be contingent upon shipment being made in a privately owned American flag vessel. Reimbursement also depended upon respondents' furnishing the United States with a notice of arrival of the vessel which had been approved for shipment of the wheat, and 7 C.F.R. § 11.12(c) (2) expressly provided that: "In the case of transshipment from a United States-flag vessel to a foreign-flag vessel, the cost of ocean freight from the port of transshipment to the importing country will not be financed by CCC." Respondents having admittedly permitted transshipment from Norfolk to India in a foreign flag vessel, without the knowledge or consent of the United States, they are clearly not entitled to reimbursement for freight charges thereby incurred. We do not find that the two prior instances respondents point to where the United States reimbursed respondents despite the use of foreign flag vessels binds the United States to make payment in the instant case. Cf. Alcoa S. S. Co. v. United States, 338 U.S. 421, 70 S.Ct. 190, 94 L.Ed. 225 (1949). We do hold, however, that, contrary to the decision of the lower court, respondents are entitled to reimbursement for so much of the freight charges as are attributable to carriage from the gulf port of Galveston to Norfolk, Virginia, the point of transshipment. On this leg of the voyage the cargo was carried in the approved American vessel, S. S. Mount Evans, and 7 C.F.R. § 11.12(c) (2), by barring reimbursement for transshipment in a foreign flag vessel, appears to contemplate reimbursement for so much of the voyage as is completed in an approved American flag ship. Moreover, the general purpose of the American flag vessel requirement, the promotion of American shipping, was served here to the extent of the carriage to Norfolk and the freight charges so occasioned. While no notice of arrival was given by respondents, the nature of the notice contemplated by the reimbursement agreement and attendant regulations was notice of the arrival in India of the S. S. Mount Evans. This became impossible because of the decision to transship in a different vessel, and as it appears that there is no requirement that notice of arrival of an approved vessel at the point of transshipment is necessary to recover freight charges up to that point, the notice of arrival requirement should not bar respondents from securing this limited reimbursement for freight charges. What these reimbursable charges are will have to be determined by the lower court upon remand.
 
 
 10
 Reversed and remanded for further proceedings not inconsistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 There was also a brief unreported opinion on reargument which we discuss in part in footnote 3 infra
 
 
 [2]
 Libelant did not itself own the S. S. Mount Evans, but acted as agent for the American Tramp Shipping Development Corporation, which did own the vessel
 
 
 [3]
 Respondents, by way of a motion for rehearing, raised this defense below only after the trial court had rendered its decision against them on their voluntary deviation defense. The lower court granted the motion for reargument but adhered to its original decision and opinion, holding that respondents' belated claim of fraud could not be entertained and, even if it could be, was not sustained on the record. We agree