STEAMSHIP WILLDOMINO *v.* CITRO CHEMICAL COMPANY.

STEAMSHIP WILLDOMINO *v.* PFIZER & COMPANY.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE THIRD CIRCUIT.

Nos. 29, 30. Argued January 22, 1926.—Decided January 3, 1927.

1. An inexcusable deviation from her permitted course renders a vessel liable as an insurer for any damage suffered by the cargo. P. 725.

2. A steamship, bound from Messina, Sicily, to New York, put into the Azores for repairs, and thence cleared for New York with a supply of coal known by her owners and officers to be grossly inadequate for the trip, and, after sailing for some days in that direction, until the inadequacy became manifest, changed her course to North Sydney, Nova Scotia, where she recoaled before proceeding to her destination. *Held* that there was an inexcusable deviation, even if she had a right to go to North Sydney from the Azores and so intended when leaving there, since in that event the preliminary sailing towards New York was unjustifiable; whereas, if the duty

was to sail direct to New York, the change of course to North Sydney was due to negligence in not supplying fuel.  P. 726.

3. An emergency sufficient to excuse a departure cannot arise out of circumstances deliberately planned nor from gross negligence. P. 727.

300 Fed. 5, affirmed.

CERTIORARI (266 U. S. 297) to decrees for damages to cargo, entered by the Circuit Court of Appeals, reversing the District Court, in proceedings *in rem* against a vessel.

*Messrs. George C. Sprague* and *Francis Rawle,* with whom *Messrs. George W. Betts, Jr.,* and *Joseph W. Henderson* were on the brief, for petitioner.

The voyage of the *Willdomino* was by stages. The stage beginning at Lisbon was to North Sydney; it was not to New York. The vessel was ordered by her owner to go to North Sydney, and these orders were literally obeyed. A turbine breakdown interrupted the stage from Lisbon to North Sydney and caused the vessel to put into Ponta Delgada, Azores Islands. Her orders were not changed at Ponta Delgada, and upon completion of repairs she resumed the stage of her voyage to North Sydney. She had sufficient bunker coal to reach North Sydney both upon sailing from Lisbon and from Ponta Delgada. She reached North Sydney with coal to spare. The Circuit Court of Appeals, therefore, erred in holding that she was unseaworthy upon sailing from Lisbon and from Ponta Delgada because of insufficiency of bunker coal to reach New York.

The respondent's cargo was damaged by sea-water as a result of the stranding of the *Willdomino,* which was caused by negligent navigation. The alleged unseaworthiness was in no sense causally connected with the stranding and the consequent damage to the cargo. Both courts below so found.

The voyage to North Sydney was not a deviation. The liberties of the bills of lading gave the *Willdomino* the right to go to North Sydney for sufficient bunkers to

carry her to New York. The liberty of bunkering in the printed clause was not narrowed by the clause of handwriting. "Filling up" refers only to cargo and not to fuel for bunkers. Where the bill of lading contains a clause providing that the vessel may call "at any port or ports in or out of the customary route in any order," or other words of similar import, it is uniformly held that she is entitled to proceed to and stop at ports which are off the regular and customary route (if sucn changes are reasonable). Such a departure is not a deviation, because the parties have agreed that it shall not be. *South Atl. S. S. Line* v. *London Stores Co.*, 255 Fed. 306; *The Blandon*, 287 Fed. 722; *The Panola*, 1925 A. M. C. 1173; *Akbar & Sons* v. *Persian S. S. Co.*, 11 Com. Cas. 219; *Attorney General* v. *Smith & Co.*, 34 T. L. R. 566; *Citta di Messina*, 169 Fed. 472; *Austrian S. S. Co.* v. *Calafiore*, 194 Fed. 377; *Emelia S. de Perez*, 187 Fed. 361, affirmed 288 Fed. 1019; *The Tokuyo Maru*, 7 Fed. (2d) 889.

The liberties of the bills of lading gave the *Willdomino* the right (had she desired so to do) to take sufficient bunkers at North Sydney to get away from New York, as well as to get there. *Austrian Union S. S. Co.* v. *Calafiore*, 194 Fed. 377; *Shipping Board* v. *Bunge & Born, Ltd.*, 41 T. L. R. 73.

Admitting for the purpose of the argument that the ship was unseaworthy upon sailing from Lisbon and from Ponta Delgada because of an insufficient coal supply, and that the stranding was the result of faults or errors in navigation, yet, since there was no causal relation between such unseaworthiness and the stranding which caused the damage to respondent's cargo, neither the ship nor the shipowner was by such unseaworthiness deprived of the protection of the Harter Act. *International Nav. Co.* v. *Farr Mfg. Co.*, 181 U. S. 218; *The Southwark*, 191 U. S. 1; *The Wildcroft*, 201 U. S. 378; *The Turret Crown*, 282 Fed. 354; 284 Fed. 439; 297 Fed. 766. Also, English cases:

*The Europa,* [1908] 98 L. T. R. 246; *Havelock* v. *Geddes,* (1809) 10 East 555; *Kish* v. *Taylor,* (1912) A. C. 604; *Atlantic Shipping Co.* v. *Dreyfuss,* (1922) A. C. 250; *Elder & Co.* v. *Patterson,* (1924) A. C. 522. See also the British " Carriage of Goods by Sea Act, 1924." This Act follows the Hague Rules of 1921 and 1922. A diplomatic conference on maritime law was held at Brussels in October, 1922, and it adopted the Hague Rules with slight modifications. See Scrutton, Charter Parties and Bills of Lading, 12th ed., 1925, App. IV.

The interpretation for which we contend will bring the law in the United States into conformity with the law of Great Britain. *The Eliza Lines,* 199 U. S. 119; *Queen Ins. Co.* v. *Globe Ins. Co.,* 263 U. S. 487.

The Harter Act should be so construed as to include the rule of causal relation between the unseaworthiness and the disaster causing cargo damage. *The Irrawaddy,* 171 U. S. 187; *The Southwark,* 191 U. S. 1; *The Jason,* 225 U. S. 32; *International Nav. Co.* v. *Farr Mfg. Co.,* 181 U. S. 218; *The Turret Crown,* 282 Fed. 354; Parsons, Shipping, vol. I, p. 320; 16 Harv. Law Rev. 157; *Havelock* v. *Geddes,* 10 East 555. The Harter Act is concerned only with seaworthiness in which deviation plays no part. The sole effect of deviation is to displace the bill of lading. *The St. Johns,* 263 U. S. 119.

The petitioner took reasonable care of the damaged merchandise after the stranding.

*Mr. D. Roger Englar,* with whom *Mr. James D. Carpenter, Jr.,* was on the brief, for respondents.

The court below found that it was the deliberate purpose of the petitioner not to take on board sufficient coal to carry the vessel to New York, but only barely enough to carry her to North Sydney; and to conceal this intent and put into North Sydney as a port of refuge under a necessity created by the petitioner itself. The court found that the vessel was, therefore, unseaworthy, and

that this unseaworthiness resulted directly from the owner's cable instructions. These findings are fully sustained by the evidence.

Having failed to use due diligence to make the *Willdomino* seaworthy as required by § 3 of the Harter Act, 27 Stat. 445, and having on the contrary, directed her to sail in an unseaworthy condition, the petitioner, as owner of the vessel, cannot invoke the protection of that section, but is liable for damage to cargo resulting from the negligence of its servants. *The Jason,* 225 U. S. 32; *International Nav. Co.* v. *Farr Mfg. Co.,* 181 U. S. 218; *The Wildcroft,* 201 U. S. 378; *The Southwark,* 191 U. S. 1.

Petitioner's argument is that it would be absurd to hold it responsible, on account of the shortage of fuel, for damage which did not result from that cause. This argument is plausible enough on its face, but it is based on a misstatement of the facts. The petitioner was not held liable because its vessel was short of fuel, but because its servants were guilty of negligence in navigation, which directly caused the damage to respondents' cargo. The basis of petitioner's liability is the fundamental principle of all law, that one who negligently damages the property of another is liable for the damage; together with the rule of *respondeat superior,* which extends this liability to include the negligence of his servants. It is true that Congress has created a statutory modification of this general liability, of which the petitioner might have obtained the benefit by complying with the conditions upon which it is granted. Not having complied with these conditions, the petitioner, of course, cannot obtain the benefits of the statute.

The very structure of the third section of the Harter Act clearly indicates that there is no causal connection contemplated between the condition and the exemption. There will rarely be any connection between unseaworthiness and negligence in navigation; and yet due diligence

to make the ship seaworthy is made the condition of exemption in respect of negligent navigation.   If the Act were based on causal relation, one would expect that a shipowner who had used due diligence to make his ship seaworthy would be relieved from liability for losses resulting from unseaworthiness.   The Act does not say this, however, and is not so construed.   *The Carib Prince,* 170 U. S. 655.

Owing to the deviations of the *Willdomino* from the voyage specified in the bills of lading, the petitioner has forfeited all protection under the clauses of its bills of lading, and is liable as an insurer of libellants' goods.   *The Citta di Messina,* 169 Fed. 472; *The Dunbeth,* (1897), P Div. 133; *Scaramanga* v. *Stamp,* 5 C. P. Div. 295; *Davis* v. *Garrett,* 6 Bing. 716; *Leduc* v. *Ward,* 20 Q. B. Div. 475; *Bond* v. *The Cora,* 3 Fed. Cas. No. 1620; *Johnson* v. *New York Cent. R. R.,* 33 N. Y. 610; *Knox* v. *The Ninetta,* 14 Fed. Cas. 827; Carver, Carriage of Goods by Sea, 6th ed., p. 398; Am. & Eng. Enc. L., vol. 7, p. 208; *Morrison* v. *Shaw,* (1916), 2 K. B. 783; *South Atlantic S. S. Line* v. *London-Savannah Co.,* 255 Fed. 306; *The Blandon,* 287 Fed. 722; *Emelia S. de Perez,* 1923 Am. Mar. Cas. 42.

The *Willdomino* deviated on the voyage from Ponta Delgada to North Sydney in not following the direct route; the uncontradicted testimony of the officers of the *Willdomino* establishes that they followed the course to New York for several days and then changed their course for North Sydney.   *Michaels* v. *Railroad,* 30 N. Y. 564; *Constable* v. *Nat. S. S. Co.,* 154 U. S. 51; *Hostetter* v. *Park,* 137 U. S. 30; Carver, Carriage of Goods by Sea, 6th ed., p. 393; 9 Amer. & Eng. Encyl. of Law, pp. 419–421; 26 Cyc. 625.   In proceeding to North Sydney instead of to New York direct, the *Willdomino* would have been guilty of an unjustified deviation, even if she had proceeded from Ponta Delgada to North Sydney by the most direct route.

As found by the Circuit Court of Appeals, the petitioner is liable, irrespective of unseaworthiness or deviation, because of its gross neglect to care for and preserve the respondents' cargo after the disaster.

MR. JUSTICE MCREYNOLDS delivered the opinion of the Court.

Respondents instituted proceedings *in rem* against the "Willdomino," a British vessel, to recover the value of five hundred and three (168 and 335) casks of citrate of lime owned by and consigned to them, which she accepted June 10, 1920, at Messina, Sicily, for delivery at New York, subject to issued bills of lading. After leaving Messina the vessel put in at Gibraltar, Lisbon, Ponta Delgada (The Azores), North Sydney (Nova Scotia) and Halifax. While passing between the last-named ports, through negligent navigation, she struck a reef or submerged object; water filled her forward compartment and respondents' goods were so damaged that they refused acceptance at destination. The causes were heard upon the same record and present identical questions. In the District Court petitioner prevailed; but the Circuit Court of Appeals thought otherwise and entered judgments for the damages sustained. 300 Fed. 5.

The petition for certiorari alleges that the causes involve three questions—

1. When in normal condition citrate of lime contains sixty-four per centum of citric acid; the cargo offered for delivery at New York contained sixty per centum of citric acid. Was it in sound condition?

2. Having regard to the bills of lading, did the "Willdomino" deviate when she went to North Sydney?

3. Must there be causal connection between the lack of due diligence to make a vessel seaworthy and the accident from which damage results in order to deprive the

vessel of the exemptions granted by § 3 of the Harter
Act?*

We confine our consideration to the points specified by
the petition and agree with the conclusions of the Circuit
Court of Appeals concerning the essential facts, although
they are radically different from those of the trial court.
It is unnecessary now to discuss the evidence—that was
adequately done below.

The first of the above-stated questions has not been
pressed here and is either abandoned or inconsequential.

The Circuit Court of Appeals, we think, rightly held
that the "Willdomino" made an inexcusable deviation
from the permitted course when she went to North Syd-
ney. Consequently, she became liable as an insurer for
any damage suffered by the cargo. *St. Johns Corp.* v.
*Companhia Geral, etc.,* 263 U. S. 119, 124; *The Citta di
Messina,* 169 Fed. 472, 474, 475; *The Sarnia,* 278 Fed. 459.

Except as to inserted name of the consignee and num-
ber of casks the printed bills of lading were identical.
They acknowledge receipt of ".  .  .  casks citrate of
lime " " for shipment, in apparent good order and condi-
tion, from Ferd. Baller & C., to be transported by the good

---

* " SEC. 3. That if the owner of any vessel transporting merchandise
or property to or from any port in the United States of America
shall exercise due diligence to make the said vessel in all respects
seaworthy and properly manned, equipped, and supplied, neither the
vessel, her owner or owners, agent, or charterers shall become or be
held responsible for damage or loss resulting from faults or errors in
navigation or in the management of said vessel nor shall the vessel, her
owner or owners, charterers, agent, or master be held liable for losses
arising from dangers of the sea or other navigable waters, acts of
God, or public enemies, or the inherent defect, quality, or vice of the
thing carried, or from insufficiency of package or seizure under legal
process, or for loss resulting from any act or omission of the shipper
or owner of the goods, his agent or representative, or from saving or
attempting to save life or property at sea, or from any deviation in
rendering such service." Act of February 13, 1893, (the Harter
Act) c. 105, 27 Stat. 445.

Steamship Willdomino to New York, with liberty to call at intermediate ports or any port or ports in or out of the customary route in any order, to receive and discharge coal, cargo, passengers, and for any other purposes." And they provide: " The ship has liberty of filling up and/or bunkering at any port or ports in or out of the way." " Filling up only in ports on the way westwards of New York," is written at the bottom of each bill, and all agree that *of* therein really means *to*.

The " Willdomino " left Messina with five hundred and sixty-nine tons of coal—not sufficient under any circumstances to carry her to New York. At Gibraltar, a customary coaling port, she took on four hundred tons and left there for Lisbon with seven hundred and fifty-six tons in her bunkers. From Lisbon she cleared for New York—two thousand, nine hundred and five miles away—with but six hundred and fifty-one tons, an inadequate amount. When five days out from Lisbon an accident befell the high-pressure turbine and she put into Ponta Delgada for repairs. Finding that port not properly equipped therefor, the master decided to proceed on the low-pressure turbine alone. She took on two hundred and fifty tons of coal and cleared for New York—two thousand, two hundred and ninety miles—with six hundred and twenty-nine tons on board. This was grossly inadequate for that distance, as her officers knew. After proceeding five or six days toward New York it became manifest that there was not enough coal to make that port and thereupon she radically changed her course and proceeded to North Sydney, where she arrived with sixty-two tons.

It is clear enough that for some reason not quite definitely disclosed the officers of the vessel under direction of the owners, while realizing that there was not enough coal on board for such voyage, wished to create the impression that she left Ponta Delgada bound directly

for New York, when in truth they intended to take her to North Sydney under pretense of an emergency.

In such circumstances by proceeding for five or six days in the direction of New York the vessel deviated from any permissible course to North Sydney, even if it be true, as her counsel now maintain, that she had the right to go and intended to proceed to the latter port from Ponta Delgada.

If, on the other hand, the vessel started from Ponta Delgada with the intention of going to New York, the only emergency claimed to justify departure from the ordinary course and procedure to North Sydney arose from wilful failure to take on sufficient coal.

An emergency sufficient to excuse a departure cannot arise out of circumstances deliberately planned nor from gross negligence.

Whether the intention was to proceed directly from Ponta Delgada to New York, as counsel for the petitioner are said to have maintained below, or to North Sydney, as they now insist, there was inexcusable departure.

" In the law maritime a deviation is defined as a ' voluntary departure without necessity or any reasonable cause from the regular and usual course of the ship insured.' " *Constable* v. *National Steamship Co.*, 154 U. S. 51, 66.     " The voyage must be prosecuted without unnecessary delay or deviation. The shipowner's. undertaking is that he will be diligent in carrying the goods on the agreed voyage and will do so directly without any unnecessary deviation." *Carver on Carriage of Goods by Sea*, 6th Ed., 393.

Nothing in the present bills of lading suggests that the vessel might wander about the sea, heading first for one port, and then without adequate reason for another. If the " Willdomino " had the privilege of going from Ponta Delgada to North Sydney and intended so to do, it was

her duty to take the ordinary course. This she did not do.

What has been said of the second question renders it unnecessary to discuss the third.

The decrees of the Circuit Court of Appeals are

*Affirmed.*