ILIGAN INTEGRATED STEEL MILLS, INC., et al., Plaintiffs-Appellants,

v.

SS JOHN WEYERHAEUSER, her engines, boilers, etc., et al., Defendants-Appellees-Appellants.

Nos. 196, 492, 493, Dockets 74–1553, 74–1574, 74–1677.

United States Court of Appeals, Second Circuit.

Argued Nov. 13, 1974.

Decided Dec. 3, 1974.

David L. Maloof, New York City (Donovan, Donovan, Maloof & Walsh, New York City, of counsel), for plaintiffs-appellants.

William Warner, New York City (Symmers, Fish & Warner, New York City, of counsel), for defendant-appellee-appellant Weyerhaeuser Co.

M. E. Deorchis, New York City (LeRoy S. Corsa, Brian D. Starer, and Haight, Gardner, Poor & Havens, New York City, of counsel), for defendant-appellee-appellant New York Navigation Co., Inc.

Before FRIENDLY, FEINBERG and GURFEIN, Circuit Judges.

FRIENDLY, Circuit Judge:

In this action for cargo damage in the District Court for the Southern District of New York, cargo appeals from that part of the judgment which limited its claim against the ship, its owner, and the time charterer to $500 per package pursuant to § 4(5) of the Carriage of Goods by Sea Act, 46 U.S.C. § 1304(5), perhaps only some $94,000, as against approximately $2,200,000 which represents the full amount of damage to cargo. The ship and its owner appeal from so much of the judgment as awarded the time charterer indemnity for all of its attorneys' fees incurred in resisting cargo's claims. The action, tried before the late Judge McLean, was disposed of in a thorough opinion by Judge Ward, 372 F.Supp. 859 (S.D.N.Y.1974), whose statement of the facts we incorporate by reference. Since we are substantially in agreement with Judge Ward's opinion, we shall limit ourselves to a few observations.

It is not disputed that the cause of the virtual destruction of plaintiff's shipment of 188 pieces of valuable machinery and parts for a steel mill was "a massive entry of seawater into the [ship's] # 3 hold, which slowly permeated the fertilizer [stowed in that hold], formed a slurry, and finally burst through the [temporary] non-watertight bulkhead into the # 2 hold, inundating and destroying the Iligan cargo." Id. at 863. The entry of seawater was due to a defect which had developed in "a pipe called a sanitary or soil line which drains from the crew's toilets, exits the ship through an opening in the hull, and permits waste to be discharged outside the ship", id. at 862. Resting on lugs over the opening of the pipe was a cover plate, called a clapper valve, which was below the level of the sea when the vessel was fully loaded; the plate was designed to swing open to allow the discharge of waste but then to close and, resisting the pressure of the ocean, prevent the entry of seawater. A damage survey after the vessel's arrival in the Far East showed that the lugs were "completely corroded

with rust, so that the valve was frozen in an open position, and the sanitary line pipe was corroded through, with a hole approximately 2″ by ¼″," 372 F.Supp. at 863, through which water entered the # 3 hold. The district judge found that the ship and its owner had not sustained their burden of proving the exercise of due diligence to make the ship seaworthy under § 4(1) of COGSA, 46 U.S.C. § 1304(1), and that New York Navigation Company, the time charterer, had breached a contractual warranty to furnish a seaworthy ship—rulings from which these parties have not appealed. However, he limited the liability of the defendants to $500 per package under § ˙4(5).

■ Plaintiff's principal contention in the trial court and on appeal, for the award of full damages against the ship and its owner, is based on what the judge called "a novel theory", 372 F.Supp. at 865. It is premised on a factual claim that the owner was on notice of the defect before the voyage began. Building on this, plaintiff contends that the owner's conduct constituted such gross negligence or wilful and wanton misconduct as to constitute an "unreasonable deviation" from the contract of carriage, and that such a deviation should "oust" the contract and deprive the carrier of the protection afforded by § 4(5). Since Judge Ward found that "plaintiff has not proved that Weyerhaeuser knew or must have known of the unseaworthy condition of the ship" prior to the trans-Pacific voyage, 372 F.Supp. at 865, he did not decide what result a contrary conclusion would have demanded. Although we do not consider the judge's conclusions to be in error, even under this circuit's standard for review, Mamiye Bros. v. Barber SS Lines, Inc., 360 F.2d 774, 776–778 (2 Cir.), cert. denied, 385 U.S. 835, 87 S.Ct. 80, 17 L.Ed.2d 70 (1966); Esso Standard Oil Co. v. S.S. Gasbras Sul, 387 F.2d 573 (2 Cir. 1967), cert. denied, 391 U.S. 914, 88 S.Ct. 1808, 20 L.Ed.2d 653 (1968); Cleary v. United States Lines Co., 411 F.2d 1009, 1010 (2 Cir. 1969), the question is likely to arise again. Since it has been thoroughly argued, we think it desirable, as an alternative ground of decision, to reject the legal theory advanced by the plaintiff.

Plaintiff's argument, rearranged and supplemented to give it greater forcefulness, is essentially as follows: The cornerstone of the argument is The Willdomino, 272 U.S. 718, 725, 47 S.Ct. 261, 261–262, 71 L.Ed. 491 (1927), a pre-COGSA case in which a ship left port with a grossly inadequate supply of coal, known to be so by the carrier, which necessitated a departure from her course. During the deviation the ship struck a reef or a submerged object which caused water to enter and damage the cargo. The Supreme Court held, speaking through Mr. Justice McReynolds, that when a loss occurred during an unreasonable deviation from the agreed course of the voyage, the ship "became liable as an insurer for any damage suffered by the cargo" and could not avail itself of the Harter Act, 27 Stat. 445 (1893), exception "for damage or loss resulting from faults or errors in navigation or in the management" of the vessel. A prior English case, Joseph Thorley, Ltd. v. Ortus S.S. Co., Ltd., [1907] 1 K.B. 660, 668 (C.A.), had similarly held that an unreasonable deviation from the intended path of the voyage deprived the ship of the benefit of exceptions in the bill of lading. Subsequently, after adoption of the English Carriage of Goods by Sea Act, 1924, which like COGSA was derived from the Hague Rules and the Brussels Convention, the House of Lords held in Stag Line, Ltd. v. Foscolo Mango & Co., Ltd., [1932] A.C. 328 (1931), that the *Thorley* principle continued to prevail despite the fact that Art. IV–5 of the English statute, the equivalent of § 4(5) of COGSA, on its face contained no exception for losses due to unreasonable deviation. Lord Atkin there stated:

I pause here to say that I find no substance in the contention faintly made by the defendants that an unauthorized deviation would not displace the statutory exceptions contained in

the Carriage of Goods by Sea Act. I am satisfied that the general principles of English law are still applicable to the carriage of goods by sea except as modified by the Act: and I can find nothing in the Act which makes its statutory exceptions apply to a voyage which is not the voyage the subject of "the contract of carriage of goods by sea" to which the Act applies.

*Id.* at 340. Reaching the same conclusion, Lord Russell of Killowen said:

It was well settled before the Act that an unjustifiable deviation deprived a ship of the protection of exceptions. They only applied to the contract voyage. If it had been the intention of the legislature to make so drastic a change in the law relating to contracts of carriage of goods by sea, the change should and would have been enacted in clear terms.

*Id.* at 347.

Plaintiff's next building stone is St. Johns N.F. Shipping Corp. v. S.A. Companhia Geral Commercial, 263 U.S. 119, 44 S.Ct. 30, 68 L.Ed. 201 (1923), which, like The Willdomino, preceded COGSA. Unlike the cases of geographical deviation discussed up to this point, here the vessel had breached its agreement to stow a cargo of barrels containing rosin under deck and they had to be jettisoned during a storm. The Court, again speaking through Mr. Justice McReynolds, said:

By stowing the goods on deck the vessel broke her contract, exposed them to greater risk than had been agreed and thereby directly caused the loss. She accordingly became liable as for a deviation, cannot escape by reason of the relieving clauses inserted in the bill of lading for her benefit, and must account for the value at destination.

*Id.* at 124–125, 44 S.Ct. at 31 (footnotes omitted).[1]

The next element vital to the construction of plaintiff's argument is Jones v. The Flying Clipper, 116 F.Supp. 386 (S.D.N.Y.1953), where Judge Weinfeld, drawing these lines of authority together, ruled that when the ship had breached its carriage agreement by transporting cargo on deck, which the *St. Johns* case forced the carrier to concede to be "a 'deviation' in law", 116 F.Supp. at 387, the ship could not avail itself of § 4(5) of the COGSA. The final block supporting plaintiff's argument, which it has not cited to us, was this court's approval of *The Flying Clipper* in Encyclopaedia Britannica, Inc. v. S.S. Hong Kong Producer, 422 F.2d 7, 18 (2 Cir. 1969), cert. denied, 397 U.S. 964, 90 S.Ct. 998, 25 L.Ed.2d 255 (1970).[2]

Relying on this structure, plaintiff urges that we should expand the concept of "quasi deviation", see 2 Carver, Carriage by Sea, §§ 750, 750A, 750B (12th ed. 1971), which entitles the shipper to

---

1. Although Mr. Justice McReynolds cited no authority for holding unauthorized deck storage to be a "deviation", this court had so held in The Sarnia, 278 F. 459 (2 Cir. 1921), cert. denied, 258 U.S. 625, 42 S.Ct. 382, 66 L.Ed. 797 (1922), mentioned in another portion of Mr. Justice McReynolds' opinion. This was over a dissent by Judge Mack to the effect that, however the carrier's actions were characterized, the contractual limitation of liability should not be displaced. *See also* Niles-Bement-Pond Co. v. Dampkiesaktieselskabet Balto, 282 F. 235 (2 Cir. 1922), where Judge Hough, a great admiralty judge, expressed the same view as Judge Mack's in a case of overcarriage but felt compelled by *The Sarnia* to concur in a displacement of the damage limitation.

2. Relying on the language and structure of the statute, at least one court of appeals had

rejected the reasoning of *The Flying Clipper*, holding that despite an unreasonable geographic deviation by the carrier its liability was limited to $500 pursuant to § 4(5). *See* Atlantic Mutual Ins. Co. v. Poseidon Schiffahrt, 313 F.2d 872, 874–875 (7 Cir.), cert. denied, 375 U.S. 819, 84 S.Ct. 56, 11 L.Ed.2d 53 (1963) (overcarriage of goods by shipper coupled with delay of one and one-half years in delivery). *See also* Nassau Glass Co. v. Noel Roberts, Ltd., 249 F.Supp. 116 (S.D.Fla. 1965) (on deck storage of plate glass). *But see* Searoad Shipping Co. v. E. I. Dupont de Nemours & Co., 361 F.2d 833, 835–836 (5 Cir.), cert. denied, 385 U.S. 973, 87 S.Ct. 511, 17 L.Ed.2d 436 (1966) (shipper liable in full as an insurer of the cargo where damage resulted from on-deck deviation).

treat the carriage contract as abrogated, thereby eliminating the damage limitation contained in § 4(5) of COGSA,[3] to include gross negligence or wanton and wilful misconduct in tendering an unseaworthy ship.

We think the principle of "quasi-deviation" is not one to be extended. As previously noted, even the holding that a deviation in the geographical sense voids limitations on the carrier's liability seems inconsistent with the language of COGSA. It has been justified in part by what is—or at least was—the especially serious effect of such a deviation on the shipper. As Lord Atkin explained in Hain S.S. Co. v. Tate & Lyle, 41 Com. Cas. 359, 55 Ll. L.R. 159, 173 (1936), quoted in 1 Carver, *supra*:

> No doubt the extreme gravity attached to a deviation in contracts of carriage is justified by the fact that the insured cargo-owner when the ship has deviated has become uninsured.

See to the same effect Gilmore & Black, Admiralty § 3.40 at 156 (1957), also questioning whether the premise with respect to marine insurance is true today, and The Citta di Messina, 169 F. 472, 474–475 (S.D.N.Y.1909) (" 'deviation' is a term of art, belonging in the main to the law of marine insurance", Hough, *J.*). Up to this point the concept of "quasi deviation" in the United States has recognized only one instance, deck stowage of cargo which the carrier had agreed to carry below deck, for which the carrier becomes liable in full as an insurer of the shipper's cargo. Whatever may be thought of that principle, it is easy to administer and carriers know the risks.

In contrast, acceptance of plaintiff's argument would mean that in almost all cases of loss due to unseaworthiness, in addition to the inquiry, directed by § 4(1)

of COGSA, whether the carrier had used due diligence to make the ship seaworthy, with the burden cast on the carrier or other person claiming exemption under that section,[4] shippers or, realistically, their insurers would demand a further inquiry into the degree of the carrier's culpability, with enormous potential liability, as illustrated by this case, riding on the decision of the fact finder, protected in many circuits by the "unless clearly erroneous" rule, *see, e. g.*, Merritt v. Interstate Transit Lines, 171 F.2d 605, 608–609 (8 Cir. 1948); Imperial Oil Co. v. Drlik, 234 F.2d 4, 10 (6 Cir.), cert. denied, 352 U.S. 941, 77 S.Ct. 261, 1 L.Ed.2d 236 (1956); Pacific Tow Boat Co. v. States Marine Corp., 276 F.2d 745, 752 (9 Cir. 1960), and enjoying great weight even in this one. This is a quite different matter from introducing the concept of gross negligence on the limited issue of whether a geographical deviation was unjustifiable. See The Willdomino, *supra*, 272 U.S. at 725–728, 47 S.Ct. 261; The Waalhaven, 36 F.2d 706, 709 (2 Cir. 1929), cert. denied, 281 U.S. 747, 50 S.Ct. 352, 74 L.Ed. 1159 (1931). The difficulties that have been experienced in defining and applying varying degrees of negligence or even the concept of "wilful and wanton" are indicated in Prosser, Torts § 34 (4th ed. 1971). In the case of international air transportation, when it was desired that a limitation on liability should be lost by wilful misconduct, clear language appropriate to that end was used. Warsaw Convention, Art. 25, 49 Stat. 2 at 3000, 3020. If cases relating to pre-COGSA facts are relevant, as they unquestionably are, *see* Gilmore & Black, *supra*, § 3.25 at 127, Royal Insurance Co., Ltd. v. United States, 87 F.2d 714, 716 (2 Cir. 1937) is very much in point. Distinguishing cases such as *The Willdomino* where the known unseaworthiness made

---

**3.** Although § 4(5) reads as if it had independent force, COGSA "regulates the terms of ocean carriage by the indirect but highly efficacious device of dealing with the terms of the ocean bill of lading", Gilmore & Black, Admiralty § 3.25 at 124 (1957).

**4.** With the limitations in § 4(5) available and generally prevailing, doubtless many such cases are settled by payment of part or all of the amount there provided, without action having been brought or at least without a trial.

completion of the agreed voyage impossible without geographical deviation, we there held that the fact that the owner's officers "determined to take a chance and needlessly risked new perils in the voyage" did not justify applying the doctrine of deviation so as to disregard provisions of the bill of lading with respect to giving notice of damage. In sum, loss due to an allegedly exceptional degree of negligence in furnishing an unseaworthy ship falls into Lord Diplock's category of risks concerning which "it is more practical and economical from the point of view of insurance to spread the risk to the cargo in excess of a fixed limit among a number of cargo insurers rather than to concentrate it in the carrier's [protection and indemnity] insurer." Diplock, Conventions and Morals—Limitation Clauses in International Maritime Conventions, 1 J.Mar.L. & Comm. 525, 528–29 (1970).

■ We agree with and have nothing significant to add to Judge Ward's disposition of Iligan's other arguments against the ship and its owner, and also against the time charterer, New York Navigation Co., Inc., which had agreed to provide seaworthy ships for the transportation of Iligan's machinery.[5]

■ We likewise adopt the portion of Judge Ward's opinion, 372 F.Supp. at 872, allowing New York Navigation to recover from the ship and its owner all the attorneys' fees which it incurred in resisting Iligan's claims. Although some of these concerned the effect of New York's warranty of seaworthiness as against the lesser liability imposed by § 4(1) of COGSA and the necessity of having to field Iligan's attempts to show that New York had not effectively incor-

porated the COGSA limitation, these were foreseeable consequences of the breach of the warranty of seaworthiness in the time charter. New York may also recover attorneys' fees for resisting Iligan's claims in this court. If the parties are unable to reach an agreement concerning the appropriate amount of those charges, they shall be fixed by the district court.

The judgment is affirmed and the cause remanded to the district court for the addition of a provision in the judgment conforming to the last two sentences of the preceding paragraph. The ship and its owner may recover their costs on appeal against Iligan. New York Navigation may recover three-quarters of its costs against Iligan and one-quarter against the ship and its owner.

---

5. Iligan advances one argument against New York Navigation's entitlement to the per package limitation which is not discussed in Judge Ward's opinion. This is that the contract between Iligan and New York Navigation states that it is to be governed by New York law and § 7–309(2) of the Uniform Commercial Code as adopted in New York allows a carrier to limit liability to a value stated in a bill of lading only when the carrier's rates are dependent on value. Assuming that the argument was advanced below and

thus is properly before us, it is without merit in light of UCC § 7–103, which reads:

Relation of Article to Treaty, Statute, Tariff, Classification or Regulation

To the extent that any treaty or statute of the United States, regulatory statute of this State, or tariff, classification or regulation filed or issued pursuant thereto is applicable, the provisions of this Article are subject thereto.