### AGFA–GEVAERT, INCORPORATED, Plaintiff,

v.

### S/S "TFL ADAMS", her engines, boilers, tackle, etc., Trans Freight Lines, Inc., Defendants.

### No. 82 Civ. 4038 (SWK).

United States District Court, S.D. New York.

Oct. 24, 1984.

Yorkston W. Grist, P.C. by David L. Mazaroli, New York City, for plaintiff.

Dougherty, Ryan, Mahoney, Pellegrino, Giuffra & Zambito by Peter J. Zambito, Thomas L. Tisdale, New York City, for defendants.

## MEMORANDUM OPINION
## AND ORDER

KRAM, District Judge.

The above-captioned action is before this Court upon the cross-motions of the parties: plaintiff moves to strike defendants' assertion of an affirmative defense purporting to limit their liability to $500 per package; defendants move to enforce the affirmative defense and limit their liability (admitting liability for the purposes of these motions only) to $500 per package, pursuant to 46 U.S.C. § 1304(5). For the reasons stated below, both motions are DENIED.

## BACKGROUND

Plaintiff, Agfa-Gevaert, Inc. ("Agfa"), is a New Jersey corporation, and is the domestic affiliate of Agfa-Gevaert N.V.

("N.V."). N.V. manufactures photographic film.

Defendant Trans Freight Lines, Inc. ("TFL"), a Delaware corporation, is a common carrier. TFL was at all pertinent times the charterer of the "TFL ADAMS," a containerized cargo vessel engaged in the common carriage of goods between Europe and the United States.

On or about June 12, 1981, N.V. booked, through De Keyser Thorton ("DKT"), TFL's Antwerp agent, a shipment of film from Mortsel, Belgium to Port Elizabeth, New Jersey. (Stipulated Facts ("SF"), # 5)[*] The booking called for the film to be transported in a refrigerated container (hereinafter called a "reefer"), to be provided by TFL, which was to be maintained at temperatures between eight and ten degrees centigrade. (SF, # 5) A reefer container is externally different in appearance from a dry (non-refrigerated) container, although a reefer container can be used to transport unrefrigerated cargo. (SF, # 7)

The freight paid for this shipment was $2,317.50. This sum was based on TFL's reefer rate of $128.75 per metric ton, with a minimum charge equal to that for eighteen tons. (SF, # 19) The freight which would have been paid had N.V. booked dry transport was substantially lower— $1,638.75 based on a rate of $109.25 per metric ton, minimum of fifteen tons. (*Id.*)

Pursuant to the aforementioned booking, TFL designated a reefer container, TFLU 9451020, in which to transport the film. (SF, # 7) This particular unit required an external power source to be operated as a refrigerating unit. (*Id.*) During the land portion of the carriage, a detachable diesel unit was attached to the reefer. (*Id.*)

On June 15, 1981, TFL pre-set and activated the reefer unit at a terminal in Rotterdam. (SF, # 9) The unit was then sent to the Seaport Terminal in Antwerp. (SF, ## 9, 10) On June 16, 1981, the unit was

---

[*] The parties have stipulated that the shipment was booked from Mortsel to Port Elizabeth. The bill of lading (SF, Exh. J) indicates that combined carriage was from Antwerp to the Port of New York. The Court will accept the parties Stipulation for purposes of addressing these motions.

sent to N.V.'s factory in Mortsel, a suburb of Antwerp, to be filled with the cargo. (SF, # 11) N.V. loaded the cargo into the reefer container and returned it to the Seaport Terminal in Antwerp the same day. (SF, # 12)

On June 18, 1981, the loaded reefer container was moved by an independent trucker retained by TFL from Antwerp to the ECC terminal in Rotterdam. (SF, # 13)

At all pertinent times prior to arrival at the ECC terminal, the refrigeration unit on the reefer container was in operation and temperatures maintained at between eight and twelve degrees centigrade. (SF, Exhs. A, B, D)

Upon arrival at the ECC terminal, the portable diesel power unit was detached and dropped off. (SF, # 14) The reefer container was then transported to the ECT terminal in Rotterdam for loading upon the TFL ADAMS. (*Id.*) The refrigeration unit on the reefer container was turned off for approximately one hour between the drop off of the portable power unit and delivery to the ECT terminal. (*Id.*)

The following day, the reefer container was loaded aboard the TFL ADAMS, pursuant to TFL's stowage plan which called for the container to be stowed above deck "dry" (*i.e.*, non-refrigerated). (SF, # 17)

An on-board combined transport bill of lading was issued by TFL on June 19, 1981. (SF, # 18) The bill of lading lists N.V. as shipper and Agfa as consignee and calls for a *"REEFER* container" to be maintained at eight to ten degrees centigrade, with the attendant reefer freight rate charged. (SF, Exh. J) The bill of lading does not, however, bear any indication of excess valuation of the cargo by N.V. (*Id.*)

TFL failed to list this reefer container on its reefer manifest or loading lists as requiring refrigeration during transport; therefore, the reefer container was not plugged into the TFL ADAMS' power supply and was not operated as a reefer container throughout the voyage. (SF, # 20) TFL claims that it did not list this shipment on its reefer manifest because DKT, when it informed TFL of the booking, did not advise TFL that reefer transport had been requested. (SF, ## 26(d), 27(a))

The voyage ended on July 3, 1981, when the TFL ADAMS arrived at Port Elizabeth. (SF, # 21 as amended by Defendant's Memorandum of Law In Support of Motion, p. 2) It was discovered at that time that the reefer container had not been treated as a reefer unit during the voyage. (*Id.*)

At no time prior to shipment did N.V. declare the value of the cargo to be shipped. (SF, # 6) Agfa brought this action seeking $200,000 for damage to the film contained in forty-two packages shipped in the reefer container as described above. (SF, # 24) TFL included in its Answer, dated September 27, 1982, an affirmative defense purporting to limit its liability to $500 per package pursuant to section 4(5) of the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 1304(5).

These motions ensued. For these motions, TFL admits its liability and offers to have judgment entered for $21,000 ($500 per package for forty-two packages). (SF, # 22)

## DISCUSSION

TFL, for these motions, admits that it is liable to Agfa, but claims that the amount of its liability should be limited to $500 per package, pursuant to the terms of the bill of lading and section 4(5) of COGSA, 46 U.S.C. § 1304(5).

Paragraph 1(a) of the bill of lading provides, in relevant part, as follows:

Except as otherwise provided herein, this Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States of America ... which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the Carrier of any of its rights or immunities or an increase of its responsibilities or liabilities under said Act. The provisions stated in said Act ... shall govern before the loading on ... the vessel and throughout the entire time the Goods are in the custody of the Carrier.

Paragraph 29 of the bill of lading provides, in relevant part, as follows:

In case of any loss or damage to or in connection with Goods exceeding in actual value the equivalent of $500 ... per package, the value of the Goods shall be deemed to be $500 per package .... The Carrier's liability, if any, shall be determined on the basis of a value of $500 per package ... unless the nature of the Goods and a valuation higher than the $500 per package ... shall have been declared by the shipper before shipment and inserted in this Bill of Lading.

Section 4(5) of COGSA provides, in pertinent part, as follows:

Neither the carrier nor the ship shall in any event be or become liable for any loss or damages to or in connection with the transportation of goods in an amount exceeding $500 per package ... unless the nature and the value of such goods have been declared by the shipper before the shipment and inserted in the bill of lading.

46 U.S.C. § 1304(5).

■ The terms of ocean carriage between TFL and Agfa are established by the bill of lading, as regulated by COGSA. *See Iligan Integrated Steel Mills, Inc. v. SS John Weyerhaeuser,* 507 F.2d 68, 72 n. 3 (2d Cir.1974), *cert. denied,* 421 U.S. 965, 95 S.Ct. 1954, 44 L.Ed.2d 452 (1975); *see also* G. Gilmore & C. Black, *Admiralty,* § 3.25 at 145 (2d ed. 1975). Since it is undisputed that N.V., the shipper, neither declared the value of the goods prior to shipment nor inserted any declaration of excess valuation in the bill of lading (SF, # 6, Exh. J), the terms of the bill of lading, and section 4(5) of COGSA, *if applicable,* would limit TFL's liability.

In response Agfa makes three arguments contending that the terms of the bill of lading and COGSA are unavailing in this case: (1) that the failure by TFL to provide refrigerated transportation from Rotterdam to Port Elizabeth constituted an unreasonable deviation from the terms of the combined transport bill of lading; (2) that the issuance of an on-board bill of lading

fraudulently misrepresenting the condition of the cargo and the method of carriage constituted an unreasonable deviation; and (3) that the land portion of the combined transport was not subject to COGSA and any damages arising during that period are not subject to the $500 per package limitation. The Court will treat these arguments in reverse order.

Agfa relies on paragraph 7(b) in arguing that the provisions of COGSA are not available to limit the liability for any damage occurring prior to loading aboard the TFL ADAMS. That paragraph provides, in relevant part, that "[w]henever any stage of the combined transport is accomplished by any land ... carrier ..., such stage shall be controlled according to any law *compulsorily* applicable to such stage" (emphasis added). Agfa claims that, pursuant to this provision, the terms of the Convention on the Contract for the International Carriage of Goods by Road are applicable to the land portion of the carriage leading to delivery at the ECT terminal in Rotterdam. Agfa has not, however, shown that that Convention was compulsorily applicable to the land portion of this contract for combined transport from Mortsel to Port Elizabeth.** The bill of lading, however, expressly incorporates the provisions of COGSA for all periods when the cargo is in the carrier's custody, including the land portions of transport. Paragraph 1(a). Thus, Agfa has not persuaded this Court, at this point, that the liability limitations of COGSA were inapplicable to the land portion of the combined carriage.

Even assuming that the COGSA limits were inapplicable, Agfa would have to prove that some part of the damage occurred during the pre-loading portion of carriage. Then, and only then, the burden would shift to the defendants to prove what portion of the damages occurred while the COGSA limits protected them. At the most under this argument, Agfa could show that the COGSA limitations did not apply to the period when the cargo was in transit, during which the cargo was maintained at temperatures between eight

** See note on page 339, *supra.*

and twelve degrees centigrade except for the one hour that it was unrefrigerated between the ECC and the ECT terminals. The Court has serious doubts regarding Agfa's ability to show that *any* damage occurred during that period. The Court is not willing to assume from the minimal failure to keep temperatures below ten degrees centigrade that damage occurred, and Agfa has not proven that thus far. Accordingly, the Court is unpersuaded, at this point, that a determination that the liability limitations of COGSA were inapplicable to TFL during the land portion of the combined carriage would have any bearing on TFL's liability.

With respect to plaintiff's deviation arguments, Agfa argues essentially that any unreasonable breach of the contract of carriage constitutes a deviation ousting the terms of that contract and voiding the COGSA limitations of liability therein. TFL argues, on the other hand, that the COGSA limitations apply in all situations except when the carrier either deviates geographically from the contemplated course or improperly stows cargo on deck. This Court finds that both parties have urged overly broad interpretations of the law. *See American Inds. Corp. v. M.V. Margarite,* 556 F.Supp. 216, 218 (S.D.N.Y. 1983), *but see Iligan,* 507 F.2d at 72 ("the concept of 'quasi deviation' in the United States has recognized only one instance, deck stowage of cargo which the carrier had agreed to carry below deck").

The concept of deviation is deeply rooted in maritime law, and has been since long before the enactment of COGSA. The concept stemmed from the principle that a marine insurer was deemed to have assumed only those risks inherent in the contemplated voyage. If the carrier made a voluntary and unexcused departure from the intended course ("a deviation"), then the insurance contract was "ousted" and the insurers relieved of their obligations with respect to any loss which might occur thereafter. *See Hearne v. Marine Ins. Co.,* 87 U.S. (20 Wall.) 488, 22 L.Ed. 395 (1874); *Oliver v. Maryland Ins. Co.,* 11 U.S. (7 Cranch) 487, 3 L.Ed. 414 (1813). The shipper was, therefore, left uninsured

for its losses. As a result, the courts held that the contract of carriage itself was "ousted," and the carrier precluded from relying on any provisions in the bill of lading purporting to limit its liability—effectively making the carrier the insurer for any loss or damage resulting after the deviation. *See The Willldomino,* 272 U.S. 718, 47 S.Ct. 261, 71 L.Ed. 491 (1927).

The concept of deviation originally applied only to situations where the carrier unjustifiably changed the route, or geographically deviated from the contemplated course, of carriage. American courts, however, long ago extended the concept of deviation (sometimes referred to as quasi-deviation when a geographic departure was not involved) to cover other material breaches of the contract of carriage. *See, e.g., Propeller Niagara v. Cordes,* 62 U.S. (21 How.) 7, 24, 16 L.Ed. 41 (1858). The most common application of the quasi-deviation doctrine involved ousting the liability limitations provisions of a bill of lading when the carrier unjustifiably stowed cargo on deck despite the issuance of a clean bill of lading (connoting below deck stowage). *See, e.g., St. Johns N.F. Shipping Corp. v. S.A. Companhia Geral Commercial,* 263 U.S. 119, 44 S.Ct. 30, 68 L.Ed. 201 (1923).

The Courts have continued to apply the deviation doctrine since the enactment of COGSA. *See Encyclopaedia Britannica, Inc. v. S.S. Hong Kong Producer,* 422 F.2d 7, 18 (2d Cir.1969), *cert. denied,* 397 U.S. 964, 90 S.Ct. 998, 25 L.Ed.2d 255 (1970); *Jones v. The Flying Clipper,* 116 F.Supp. 386 (S.D.N.Y.1953). Decisions in this court, and in this Circuit, have held the deviation doctrine applicable (and the limitations provisions of COGSA inapplicable) in situations other than on-deck stowage. *See, e.g., Insurance Co. of North America v. S/S American Argosy,* No. 81 Civ. 7727, slip op. (S.D.N.Y. June 10, 1983) (transshipment to another ship during carriage); *Margarite,* 556 F.Supp. 216 (S.D.N.Y.1983) (fraudulent misrepresentation in bill of lading); *Hellenic Army Command v. S/S Livorno,* 1981 A.M.C. 1288 (S.D.N.Y.1981) (late delivery); *but see Iligan,* 507 F.2d 68 (refusing to extend to unseaworthiness).

■ Plaintiff, attempting to bring this case within the *Margarite* decision, argues that the issuance of an on-board bill of lading constituted a fraudulent misrepresentation of the condition of the cargo and the manner in which it would be transported. The Court cannot agree with this contention. As the *Margarite* court noted, a carrier is precluded from invoking the liability limitations for a *"wilful* misrepresentation of [the] condition of cargo." 556 F.Supp. at 218. There is absolutely no evidence that TFL knew, or even could have known, the condition of the film, since N.V. packed the reefer container and it arrived in apparent good condition. Certainly, TFL did not knowingly misrepresent the condition of the cargo. Likewise, there is no evidence that TFL knew that the shipment required refrigeration, knew that it would not receive refrigeration, *and* knowingly misrepresented in the bill of lading (which was initially prepared by N.V.) that refrigeration would be provided. In sum, there is no evidence of fraud in this case which would vitiate TFL's right to limit its liability.

■ On the other hand, TFL's failure to provide refrigerated transport, as the contract provided, may constitute an unreasonable deviation precluding TFL from invoking the liability limitations. Breach of a contract for special stowage by improper stowage can constitute a deviation rendering contractual or statutory liability limitations inapplicable. *See, e.g., Pioneer Import Corp. v. The Lafcomo,* 159 F.2d 654 (2d Cir.), *cert. denied,* 331 U.S. 821, 67 S.Ct. 1310, 91 L.Ed. 1838 (1947); *Jones v. The Flying Clipper,* 116 F.Supp. 386 (S.D.N.Y.1953); *see also Margarite,* 556 F.Supp. at 218 ("improper stowage constituted a 'deviation in law'"); *United States v. Wessel, Duval & Co., Inc.,* 115 F.Supp. 678, 684 (S.D.N.Y.1953) ("acceptance of a breach of contract for special stowage of cargo as a deviation," *citing Pioneer Import* ).

The Court finds *Pioneer Import* to be particularly on point, even though that case was not governed by COGSA. In that case the shipper had sought refrigerated transportation for its cargo. There was no re-

frigerated transportation available, so the shipper contracted for on-deck stowage (for lower temperatures) provided the cargo would be stored at a certain point on the deck, higher than surrounding areas, and covered by tarpaulins. The bill of lading indicated that shipment was "at shipper's risk." *Pioneer Import Corp. v. The Lafcomo,* 49 F.Supp. 559, 560 (S.D.N.Y.1943). The carrier failed to carry the cargo as it had agreed to—it was neither stowed at the proper point on the deck nor covered by tarpaulins—and the cargo was damaged. The court held that "[b]y failing to cover the shipment with tarpaulins, [the carrier] ... deviated fundamentally from the agreed method of transportation." 159 F.2d at 655. The court further held that the carrier was "deprived of the benefit of the limitation clause." *Id.*

The courts have held, however, that mere negligent stowage of goods, or stowage that is not "unreasonable," does not constitute a deviation. *See Dupont de Nemours Int'l S.A. v. S.S. Mormacvega,* 493 F.2d 97 (2d Cir.1974) *("Mormacvega"); In re Isbrandtsen Co.,* 201 F.2d 281 (2d Cir.1953). I believe that the improper stowage in this case, if found to have been reckless, would constitute an unreasonable "quasi-deviation" within the precedent of this Court. The question that remains therefore, is whether TFL's failure to provide reefer transport, as contracted and paid for, was more than negligent improper stowage. The Court holds that that question is not susceptible of an answer as a matter of law in this case. A determination of whether TFL's conduct here was reckless or merely negligent requires a factual inquiry. *See Mormacvega,* 493 F.2d at 102.

■ The facts here, I believe, might support a finding of recklessness. TFL stowed a container that was externally identifiable as a reefer container for non-reefer transportation. TFL also issued a bill of lading indicating that reefer transport was required. Had TFL double-checked, upon receipt of the reefer container, whether it indeed required refrigeration, it might have learned from that bill of lading that refrigeration was indicated. However, the Court, at this stage, cannot

determine whether TFL's failure to inquire further was reckless because a factual inquiry is necessary to ascertain the frequency that reefer containers are utilized for dry transportation, as well as to ascertain what level of inquiry, if any, was made by TFL upon receipt of this container at the ECT terminal for loading.

Since the facts in this case might support a finding of recklessness, TFL's motion to limit its liability must perforce be DENIED. Likewise, since the facts would support a finding of mere negligence, Agfa's motion to strike the affirmative defense limiting liability must also be DENIED. A pretrial conference shall be held in this case on November 9, 1984, at 2:30 P.M.

SO ORDERED.