**B.M.A. INDUSTRIES, LTD.,**
**Plaintiff-Appellant-Cross-Appellee,**

v.

**NIGERIAN STAR LINE, LTD.,**
**Defendant-Appellee-Cross-Appellant.**

**Nos. 768, 903, Dockets 85–7864, 85–7922.**

United States Court of Appeals,
Second Circuit.

Argued Feb. 3, 1986.

Decided March 19, 1986.

Bernard G. Post, New York City, for plaintiff-appellant-cross-appellee.

Thomas S. Howard, New York City (Thacher Proffitt & Wood, Dwight B. Demeritt, Jr., Michael J. Dowd, of counsel), for defendant-appellee-cross-appellant.

Before FEINBERG, Chief Judge, and VAN GRAAFEILAND and CARDAMONE, Circuit Judges.

PER CURIAM:

B.M.A. Industries, Ltd. (BMA) appeals from an order of the United States District Court for the Southern District of New York, Charles S. Haight, Jr., J., granting summary judgment to Nigerian Star Line, Ltd. (NSL) on its claim that the Carriage of Goods by Sea Act, 46 U.S.C. § 1300 et seq. (COGSA) limited NSL's liability to $500 per package. NSL cross-appeals from the district judge's award to BMA of $3,000 in

damages. NSL, a carrier, contracted with BMA to carry a container of BMA cargo from New York to Port Harcourt, Nigeria. The six bills of lading issued for the shipment on NSL's behalf by its agent, Mediterranean Agencies, all bore on their face the stamped legend:

CARGO TO BE RELEASED ONLY AGAINST SUBMISSION OF ORIGINAL DULY ENDORSED BILLS OF LADING. NO BANK LETTERS OF GUARANTEE &/OR ANY OTHER MEANS ARE ACCEPTABLE.

The original bills of lading were to be endorsed and released to Comfortex, the consignee, only after Comfortex paid sight drafts in the amount of $185,000. Comfortex was then to present the original bills to NSL and receive the cargo in exchange.

The container arrived intact in Port Harcourt, where NSL transferred it to a warehouse maintained by NSL's agent, Lagos and Niger Shipping Agencies, Ltd. (LANSAL). Subsequently, LANSAL improperly released the goods to Comfortex upon its presentation of a warehouse delivery order, rather than the original bills of lading. The parties dispute the reasons for the misdelivery. BMA claims it came about through a payment of a bribe to a LANSAL employee; NSL contends it happened because a BMA officer gave LANSAL confusing directions regarding delivery. In any event, BMA alleges that it has never been paid for the goods.

BMA brought this action against NSL for $187,703.35, the full value of the cargo. In defense, NSL argued, among other things, that COGSA applied to the loss and limited BMA's recovery to $500 per package. On motions for summary judgment by both parties, Judge Haight held that NSL had breached the contract of carriage by misdelivering the goods, but that COGSA governed at the time of the loss, limiting NSL's liability to $500 for each of the six bills of lading. He also rejected BMA's agreement that it was entitled to recover its full claim because misdelivery was an unreasonable "deviation" barring NSL from relying on COGSA's limitations.

■ BMA argues that the judge erred in finding that COGSA applied at the time of the loss. We disagree. The bills of lading provided that the statute would apply until the goods were "delivered or despatched by the Carrier from the sea terminal at the port of discharge." From uncontroverted affidavits, it was clear that NSL did not have storage facilities in the wharf area of Port Harcourt and could not have stored containers there, due to the area's congestion and lack of security. Therefore, we agree with the district judge, whose experience in admiralty matters has been substantial, that there was ample reason in light of practical realities to characterize LANSAL's warehouse as NSL's "sea terminal," although the warehouse was several miles inland. Accordingly, COGSA applied at the moment when LANSAL improperly released the cargo at its warehouse.

■ In addition, BMA urges that release of the goods to a person not holding the necessary documents was an unjustifiable "deviation," noting that a deviation that is not reasonable under COGSA § 4(4), 46 U.S.C. § 1304(4), deprives a carrier of COGSA's benefits. See *General Electric Co. v. S.S. Nancy Lykes*, 706 F.2d 80, 86–87 (2d Cir.), cert. denied, 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983). The concept of deviation grew out of the pre-COGSA law of marine insurance. A carrier's inexcusable deviation from its contract voyage would often void insurance on the cargo. To protect shippers in the event cargo was lost, courts developed the rule that a deviation prevented a carrier from invoking limitations on liability written into the contract of carriage. See *Thyssen, Inc. v. S.S. Fortune Star*, 777 F.2d 57, 63–65 (2d Cir.1985); Gilmore & Black, The Law of Admiralty § 3–40 at 176–77 (2d ed. 1975). Originally, the doctrine covered only cases of geographic departure from the contract voyage, see, e.g., *The Willdomino v. Citro Chemical Co.*, 272 U.S. 718, 47 S.Ct. 261, 71 L.Ed. 491 (1927). Other decisions extended the concept of deviation (or "quasi-deviation") to unauthorized on-deck stow-

age both prior to enactment of COGSA, see *St. Johns N.F. Shipping Corp. v. S.A. Companhia Geral Commercial*, 263 U.S. 119, 44 S.Ct. 30, 68 L.Ed. 201 (1923), and in the post-COGSA era, see *Encyclopaedia Brittanica v. S.S. Hong Kong Producer*, 422 F.2d 7, 18 (2d Cir.1969) (on-deck stowage ousts COGSA's $500 per package limitation), cert. denied, 397 U.S. 964, 90 S.Ct. 998, 25 L.Ed.2d 255 (1970); *Jones v. The Flying Clipper*, 116 F.Supp. 386 (S.D.N.Y. 1953) (same).

Appellant suggests that we further extend the doctrine to cover instances of corrupt or criminal misdelivery. For several reasons, we decline to do so. Prior to the enactment of COGSA, courts uniformly refused to characterize misdelivery as a deviation. See *Bank of California, N.A. v. International Mercantile Marine Co.*, 64 F.2d 97, 99 (2d Cir.), cert. denied, 290 U.S. 649, 54 S.Ct. 66, 78 L.Ed. 563 (1933) (surrender of goods to person not holding bill of lading does not displace contractual limitation of liability); *The Jean Jadot*, 9 F.Supp. 162, 162–64 (S.D.N.Y.1934). Since the Act was enacted, courts have taken the same position. In *Hellyer v. Nippon Yesen Kaisya*, 130 F.Supp. 209 (S.D.N.Y. 1955), Judge Weinfeld concluded, relying in part on the pre-COGSA case law, that nondelivery is not drastic enough a deviation to oust COGSA's one-year limitations period. Cf. *Italia de Navigazione, S.p.A. v. M.V. Hermes I*, 724 F.2d 21 (2d Cir.1983) (per curiam) (same; reserving question of breach's effect on $500 per package limitation).

We see no reason to depart from these authorities. The principle of quasi-deviation is arguably inconsistent with COGSA, and is "not one to be extended." *Iligan Intergrated Steel Mills, Inc. v. S.S. John Weyerhaeuser*, 507 F.2d 68, 72 (2d Cir. 1974), cert. denied, 421 U.S. 965, 95 S.Ct. 1954, 44 L.Ed.2d 452 (1975). As *Iligan* implies, the enactment of COGSA, if anything, strengthened the rationale of cases that limit the doctrine. See also *Hellyer*, supra, 130 F.Supp. at 211. Accordingly, we reaffirm the rule that misdelivery of cargo is not a deviation that bars resort to the protections of COGSA.

The alleged criminal receipt of a bribe in connection with the misdelivery does not alter our conclusion. Even assuming that LANSAL's employee was bribed and that the taking of the bribe is attributable to NSL, a proposition NSL hotly disputes, we do not believe the commission of a crime makes misdelivery a deviation. Our court repeatedly has declined to extend the doctrine of deviation on the basis of culpability or crime. In *Hermes I*, we held that "systematic thefts" by a carrier's officers and crew did not rise to the level of a deviation. 724 F.2d at 22. Our decision in *Iligan* rejected the notion that a carrier's "wanton and willful misconduct in tendering an unseaworthy ship" was a deviation. 507 F.2d at 72. See *Bank of California*, supra, 64 F.2d at 99 (citing rule that carrier is entitled to benefit of bill of lading clauses despite theft by carrier's employees). In *Iligan*, Judge Friendly wrote that probing a carrier's culpability would create too much uncertainty if a possible deviation were to hang in the balance. 507 F.2d at 72. This concern applies here as well. Were we to disregard precedent and fashion a rule that criminal misdelivery is a quasi-deviation, we would be inviting shippers to "demand a further inquiry into the degree of the carrier's culpability, with enormous potential liability ... riding on the decision of the fact finder," *id.*, in nearly every case of improper delivery. We decline to do so in order to extend the doctrine of deviation, which has been criticized by commentators and this court as one of "doubtful justice under modern conditions, of questionable status under Cogsa, and of highly penal effect." *Hermes I*, supra, 724 F.2d at 23; Gilmore & Black, supra, § 3–42 at 183.

We have considered all of BMA's other arguments as well as those of cross-appellant NSL and find them to be without merit. Accordingly, the judgment of the district court is affirmed.